### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

------------------------------------------------------------x

GEORGE KUTTY PUTHIYA PARAMPIL     :
THOMAS, RAVI THAMMINA,          :  Civil Action No.:
REGHUNADHAN                     :
PALACHUVATTILPUTHENPURA    :  (ECF CASE)
NARAYANANNAIR, BABU KARIPPAI  :
OUSEPH, SHANOJ JOSEPH, RAJAN   :
PAZHAMBALAKODE, VENKATARAO  :
BURIDI, SARMA VENKATA          :
SATYANARAYANA BHIRI, GOGY JOSEPH,
BHASKARARAO NIMMADALA, PHILIP
PINDAKADAVIL GEORGE,
MAHESHWARA RAO MOLLETTI,
MATHEW JACKSON, KANTIBHAI
KHEMABHAI PRAJAPATI, SUNNY
CHERIAN, SUBRANARAYANAN
KARUPPIAH, ASSARI KRISHNAN
THANKAPPAN, ZAKIR HUSAIN GHULAM
HUSAIN, SAJI CHETTIYARA BABY, BAIJU
PAUL, DAVIS ANTONY, JOSHY
KAIPRAMPATTU JOSEPH, GANAPATHI
RAO AKKIREDDI, YACOB THACHIL
VARGHESE, ANTONEY THARAYIL
XAVIER, SATYANARAYANA
VANGAPANDU, JOSEPH THOMAS
KANJIRAPARAMBIL, DAVID RAJU
TULOORI, SRINU KALLA, and
SIVAKUMAR RAMAKRISHNAN NAIR

v.

SIGNAL INTERNATIONAL L.L.C., SIGNAL
INTERNATIONAL, INC., SIGNAL
INTERNATIONAL TEXAS GP, LLC,
SIGNAL INTERNATIONAL TEXAS, L.P.,
GLOBAL RESOURCES, INC., DEWAN
CONSULTANTS PVT. LTD. (a/k/a,
MEDTECH CONSULTANTS), SACHIN
DEWAN, MALVERN C. BURNETT, GULF
COAST IMMIGRATION LAW CENTER
L.L.C., LAW OFFICES OF MALVERN C.
BURNETT, A.P.C., J & M ASSCIATES, INC.
OF MISSISSIPPI, BILLY R. WILKS, and
J & M MARINE & INDUSTRIAL, LLC

------------------------------------------------------------x

## COMPLAINT

1.      Plaintiffs are a group of 30 Indian men recruited, along with other similarly situated individuals, by Signal International L.L.C. ("Signal") and its agents to provide labor and services to defendant Signal in the United States through the federal government's H-2B guest worker program on the promise of a permanent residency visa, otherwise known as a "green card". Signal and its agents did not fulfill these promises and instead subjected plaintiffs to forced labor and other serious abuses at Signal operations in Pascagoula, Mississippi and Orange, Texas.

2.      Plaintiffs bring this action to recover for damages inflicted by Signal, J&M Associates, Inc. of Mississippi ("J & M"), and these entities' recruiters, attorneys, agents, alter egos, and successors operating in India, the United Arab Emirates, and the United States. Defendants collectively exploited and defrauded plaintiffs by recruiting them to work in the United States on the false promise of permanent work-based immigration and effectuating a broad scheme of psychological coercion, threats of serious harm and physical restraint, and threatened abuse of the legal process to maintain control over plaintiffs.

3.      Lured by defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, plaintiffs and their families entered into severe debt and/or sold or pawned land, jewelry, or other property to take advantage of these seemingly promising opportunities.  Plaintiffs raised this money to pay mandatory recruitment, immigration processing, and travel fees charged by defendants totaling as much as $10,000 – $25,000 per worker.  Trusting in the veracity of defendants' promises of immigration and work benefits, plaintiffs relinquished stable employment opportunities in India and as guestworkers in the Persian Gulf and other locations.

4.      Defendants and their agents threatened, coerced, and defrauded plaintiffs into paying extraordinary fees for recruitment, immigration processing, and travel, including by Dewan Consultants holding plaintiffs' passports and visas.  Defendants breached agreements with plaintiffs that had promised green cards and under which plaintiffs had performed.  Signal and its agents further caused plaintiffs to believe that if they did not work for Signal under the auspices of temporary, Signal-restricted H-2B guestworker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, and/or other serious harm.

5.      The false promises, collection of exorbitant recruiting fees, and strong-arm tactics of defendants and/or their agents and attorneys were, upon information and belief, authorized by Signal and J&M.  Upon information and belief, Signal was aware of these false promises from the start of its relationship with the Recruiter Defendants and Legal Facilitator Defendants, as described below.  However, at a minimum, Signal learned of these tactics from the very first Indian H-2B workers, who arrived at Signal's facilities in the United States as early as late October 2006.  Rather than take any adequate corrective measures, Signal ratified and perpetuated the scheme by continuing to facilitate the transportation of further waves of Indian H-2B workers, including plaintiffs herein, from November 2006 through April 2007.

6.      Upon plaintiffs' arrival in the United States, Signal required them to live in guarded, overcrowded, and isolated labor camps.  Signal and its agents further deceived plaintiffs regarding their visa status, threatened plaintiffs with loss of immigration status and deportation, and generally perpetrated a campaign of psychological abuse, coercion, and fraud designed to render plaintiffs afraid, intimidated, and unable to leave Signal's employ.

7.      On March 9, 2007, Signal, using private security guards, attempted to forcibly and unlawfully deport certain guestworkers from its labor camp in Pascagoula, Mississippi in

retaliation for speaking out against discriminatory and abusive conditions in Signal's labor camp in Pascagoula, Mississippi, and for seeking counsel to understand their legal rights.

8.      Terrified by the threat of imminent deportation, the security guards pursuing him and the other security guards detaining his fellow Indian H-2B workers, one individual, Sabulal Vijayan, attempted suicide and had to be taken to a local hospital.  During the same morning, Signal personnel and security guards successfully forced three other guestworkers into a trailer under guard.  There, Signal detained these individuals for several hours without food, water, or bathroom facilities.

9.      Having witnessed and/or heard of the events of March 9, 2007, the plaintiffs at Signal's operations in Mississippi and Texas reasonably feared that they would suffer serious harm, physical restraint, and/or abuse of legal process if they were to leave Signal's employ. Deeply indebted, fearful, isolated, disoriented, and unfamiliar with their rights under United States law, these workers felt compelled to continue working for Signal.

10.      Defendants never fulfilled their promises to provide permanent residency visas to any plaintiff, nor did they refund the exorbitant fees plaintiffs paid them in exchange for these visas.

11.      Plaintiffs assert claims against defendants arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA"); the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985); and claims for damages arising from fraud, negligent misrepresentation, and breach of contract.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1343 (civil rights).

13.     This Court has supplemental jurisdiction over plaintiffs' causes of action based on the laws of U.S. states and foreign states pursuant to 28 U.S.C. § 1367(a), as these claims arise out of the same nucleus of facts that support the federal claims.

14.     Venue in the Eastern District of Louisiana is proper under 18 U.S.C. §1965 and 28 U.S.C. § 1391 in that various defendants and/or agents of defendants, including Malvern C. Burnett, the Law Offices of Malvern C. Burnett, A.P.C., and Gulf Coast Immigration Law Center L.L.C. resided and/or may be found in New Orleans during the relevant time periods. Additionally, many of the acts described herein, including the preparation of and dissemination of false and/or misleading information occurred in this District.

## PARTIES

### Plaintiffs

15.     Plaintiffs are Indian nationals of South Asian descent and former H-2B guest workers who were recruited from India and/or the United Arab Emirates by defendants at various times between 2003 and 2007.

16.     At all relevant times, plaintiffs were "persons" within the meaning of that term as defined by RICO, 18 U.S.C. § 1961(3).

17.     At all relevant times, plaintiffs were engaged in interstate commerce and/or in the production of goods for sale in interstate commerce.

<u>Group I Plaintiffs</u>

18.     Plaintiff Reghunadhan Palachuvattilputhenpura Narayanannair was recruited in 2004 from India for work in the United States.  After arriving in the United States in late 2006, Narayanannair worked at Signal's Pascagoula, Mississippi facility.

19.     Plaintiff Kantibhai Khemabhai Prajapati was recruited in 2002 from India for work in the United States.  After arriving in the United States in late 2006, Prajapati worked at Signal's Pascagoula, Mississippi facility.

20.     Plaintiff Gogy Joseph was recruited in 2005 from India for work in the United States.  After arriving in the United States in late 2006, Joseph worked at Signal's Pascagoula, Mississippi facility.

21.     Plaintiff Philip Pindakadavil George was recruited in 2004 from India for work in the United States.  After arriving in the United States in late 2006, George worked at Signal's Orange, Texas and Pascagoula, Mississippi facilities.

22.     Plaintiff Mathew Jackson was recruited in 2003 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in late 2006, Jackson worked at Signal's Pascagoula, Mississippi facility.

23.     Plaintiff Zakir Husain Ghulam Husain was recruited in 2004 from India for work in the United States.  After arriving in the United States in 2006, Husain worked at Signal's Pascagoula, Mississippi facility.

24.     Plaintiff Davis Antony was recruited in late 2003/early 2004 from India for work in the United States.  After arriving in the United States in late 2006, Antony worked at Signal's Pascagoula, Mississippi facility.

25.     Plaintiff Antoney Tharayil Xavier was recruited in 2005 from India for work in the United States.   After arriving in the United States in 2006, Xavier worked at Signal's Pascagoula, Mississippi facility.

26.     Plaintiff Sivakumar Ramakrishnan Nair was recruited in 2004 from India for work in the United States.  After arriving in the United States in late 2006, Nair worked at Signal's Pascagoula, Mississippi facility.

27.     Plaintiff Joshy Kaiprampattu Joseph was recruited in late 2003/early 2004 from India for work in the United States.  After arriving in the United States in 2006, Joseph worked at Signal's Pascagoula, Mississippi facility.

28.     Plaintiff Yacob Thachil Varghese was recruited in late 2003/early 2004 from India for work in the United States.  After arriving in the United States in 2006, Varghese worked at Signal's Pascagoula, Mississippi facility.

<u>Group II Plaintiffs</u>

29.     Plaintiff George Kutty Puthiya Parampil Thomas was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Thomas worked at Signal's Pascagoula, Mississippi facility.

30.     Plaintiff Ravi Thammina was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Thammina worked at Signal's Pascagoula, Mississippi facility.

31.     Plaintiff Babu Karippai Ouseph was recruited in 2006 from India for work in the United States.   After arriving in the United States in late 2006, Karippai Ouseph worked at Signal's Pascagoula, Mississippi facility.

32.     Plaintiff Rajan Pazhambalakode was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Pazhambalakode worked at Signal's Pascagoula, Mississippi facility.

33.     Plaintiff Venkatarao Buridi was recruited in 2006 from India for work in the United States.  After arriving in the United States in early 2007, Buridi worked at Signal's Orange, Texas facility.

34.     Plaintiff Sarma Venkata Satyanarayana Bhiri was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Bhiri worked at Signal's Pascagoula, Mississippi facility.

35.     Plaintiff Bhaskararao Nimmadala was recruited in 2006 from India for work in the United States.  After arriving in the United States in early 2007, Nimmadala worked at Signal's Orange, Texas facility.

36.     Plaintiff Maheshwara Rao Molletti was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Molletti worked at Signal's Pascagoula, Mississippi facility.

37.     Plaintiff Ganapathi Rao Akkireddi was recruited in 2006 from India for work in the United States.  After arriving in the United States in early 2007, Akkireddi worked at Signal's Pascagoula, Mississippi facility.

38.     Plaintiff Srinu Kalla was recruited in 2006 from India for work in the United States.  After arriving in the United States in late 2006, Kalla worked at Signal's Orange, Texas facility.

39.     Plaintiff Assari Krishnan Thankappan was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2007, Thankappan worked at Signal's Orange, Texas facility.

40.     Plaintiff Satyanarayana Vangapandu was recruited in 2006 from Africa and India for work in the United States.  After arriving in the United States in 2007, Vangapandu worked at Signal's Pascagoula, Mississippi facility.

41.     Plaintiff Baiju Paul was recruited 2006 from the United Arab Emirates and India for work in the United States.  After arriving in the United States in 2006, Paul worked at Signal's Pascagoula, Mississippi facility.

42.     Plaintiff Sunny Cherian was recruited in 2006 from India for work in the United States.  After arriving in the United States in 2006, Cherian worked at Signal's Pascagoula, Mississippi facility.

Abandoned Plaintiffs

43.     Plaintiff Shanoj Joseph was recruited in 2004 from India for work in the United States.  After he arrived in the United States in early 2007, Signal rescinded Joseph's job offer and threatened to have him arrested if he reported to Signal's facilities

44.     Plaintiff Saji Chettiyara Baby was recruited in 2004 from the United Arab Emirates and India for work in the United States.  After he arrived in the United States in 2007, Signal rescinded Baby's job offer and threatened to have him arrested if he reported to Signal's facilities.

45.     Plaintiff Joseph Thomas Kanjiraparambil was recruited in late 2006 from India for work in the United States.  After he arrived in the United States in early 2007, Signal rescinded his job offer.

46.     Plaintiff David Raju Tuloori was recruited in 2007 from India for work in the United States.  After he arrived in the United States in mid 2007, Signal rescinded his job offer.

47.     Plaintiff Subranarayanan Karuppiah was recruited in 2006 from India for work in the United States.  After he arrived in the United States in 2007, Signal, through its agent Dewan, rescinded Karuppiah's job offer.

Defendants

*The Employer Defendant*

48.     Defendants Signal International, L.L.C., Signal International Texas GP, LLC, and Signal International Texas, L.P. are corporate entities organized under the laws of Delaware, whose global parent, Signal International, Inc., is organized under the laws of Delaware and provides marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas; Pascagoula, Mississippi; and Mobile, Alabama (collectively, these four entities are referred to as "Signal"). At all relevant times, Signal's decision-making headquarters was located in Pascagoula, Mississippi.

*Recruiter Defendants*

49.     Global Resources, Inc. ("Global") is or was a corporation organized under the laws of Mississippi and engaged in the business of recruiting workers from India for employment in the United States.  At all relevant times, Global conducted the recruiting in question from an office located in Mississippi.

50.     Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India, which maintains offices in Mumbai (Bombay), India, and Dubai, United Arab Emirates.

51.     Dewan Consultants' decision making headquarters is located in Mumbai, India.

52.     Sachin Dewan ("Dewan") is the Director of Dewan Consultants.  Dewan resides in India and is a citizen of India.

53.     Upon information and belief, Dewan and Dewan Consultants authorized and utilized Global and the Legal Facilitator Defendants described below, to act as their United States-based operations and/or agents.

54.     Upon information and belief, Global and the Legal Facilitator Defendants described below, authorized and utilized Dewan and Dewan Consultants to act as their India and United Arab Emirates based operations and/or agents.

55.     Upon information and belief, Dewan, Dewan Consultants, and Global, and the Legal Facilitator Defendants described below, acted as a joint venture with respect to the recruitment, contracting, and provision of plaintiffs for labor or services except for with regard to recruitment by Indo-Amerisoft and Kurella Rao[1] prior to mid-2006.

56.     Global and the Legal Facilitator Defendants described below, utilized Dewan and Dewan Consultants to conduct and carry out their shared business interests and activities in India and the United Arab Emirates.  Among other things, Global has shared offices with Dewan and Dewan Consultants in India and the United Arab Emirates.

57.     Upon information and belief, Dewan and Dewan Consultants have utilized defendants Global and the Legal Facilitator Defendants described below, to conduct and effectuate their shared business interests and activities in the United States.

---

[1]      Upon information and belief, claims against Indo-Amerisoft and its Chairman and Director, Kurella Rao, have been stayed pending the outcome of their bankruptcy proceedings.  Plaintiffs will seek leave to amend the complaint if and when the stay is lifted.

58.     Global conducted its business almost entirely in United States dollars.  Nearly every payment made to defendant Global described herein was by cashier's check drawn on United States banks and deposited in United States bank accounts.

59.     Throughout this complaint, plaintiffs refer to defendants Dewan, Dewan Consultants, and Global collectively as "Recruiter Defendants."

*Legal Facilitator Defendants*

60.     Malvern C. Burnett ("Burnett") is an attorney who resides in and maintains offices in New Orleans, Louisiana and Ocean Springs, Mississippi.

61.     Gulf Coast Immigration Law Center L.L.C. ("GCILC") is a limited liability corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Burnett serves as its sole registered agent, member, and/or corporate officer.

62.     The Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Burnett serves as its sole registered agent, member, and/or corporate officer.

63.     Upon information and belief, Burnett, GCILC, and Burnett Law Offices are engaged in a joint venture and/or are alter egos in that all entities have the same corporate mailing address, intermingle business assets, fail to operate at arms' length, and Burnett serves as the registered agent and sole member and/or corporate officers for GCLIC and Burnett Law Offices.

64.     Upon information and belief, Burnett, GCILC, and the Burnett Law Offices have the same business objectives and Burnett uses GCILC and the Burnett Law Offices to conduct and effectuate shared business objectives.

65.     Throughout this complaint, plaintiffs refer to Burnett, GCILC, and Burnett Law Offices collectively as "Legal Facilitator Defendants."

66.     The Legal Facilitator Defendants engaged in a joint venture with Kurella Rao and Indo-Amerisoft, L.L.C., described below, to conduct and carry out their shared business interests and activities in India and the United Arab Emirates.  This joint venture is in addition to the joint venture described above between the Legal Facilitator Defendants and the Recruiter Defendants.

67.     The Legal Facilitator Defendants conducted their business almost entirely in United States dollars.  Nearly every payment made to the Legal Facilitator Defendants described herein was by cashier's check drawn on United States banks and deposited in United States bank accounts.

*Labor Broker Defendants*

68.     J & M Associates of Mississippi, Inc. ("J & M"), a corporation organized under the laws of Mississippi, was at all relevant times engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.  At all relevant times, J & M operated its labor brokerage services from its headquarters in Mississippi.

69.     Billy R. Wilks ("Wilks") was the founder and general manager of J & M and currently acts as a consultant for the company.  Upon information and belief Wilks had full control and decision-making authority over J & M such that J & M and Wilks were alter egos of one another.  Wilks was personally liable for the conduct of J & M as he had full control and decision-making authority over J & M such that J & M and Wilks were alter egos of one another.  At all relevant times, Wilks lived in Moss Point, Mississippi.

70.      Wilks is the founder of J & M.  He incorporated it in 1996.  The main corporate office of J & M is Wilks' home.  J & M, during the time relevant to this litigation, was entirely beholden to Wilks for its business activity.  Further, Wilks has testified that, during the time relevant to this litigation, all of J & M's decisions and policy changes would have to be approved by him.  He was the main decision-maker with regard to all of the company's relevant business activity.  Both Wilks and his former lawyer describe Wilks as the only person who knows anything about the company and that it is indeed his company, even though Wilks' sons also participated substantially in the conduct of the company.

71.      At some point prior to 2007, J & M was sued in unrelated litigation.  In response to that lawsuit, Wilks set up a new corporation domiciled and incorporated in Mississippi – J & M Marine & Industrial LLC ("J & M Marine") – primarily to avoid the litigation then pending against J & M, but also to continue the work that was underway with J & M.

72.      Wilks used the contractual arrangements and relationships he had set up between J & M and the Recruiter Defendants to create profitable opportunities for his new J & M Marine entity.  In other words, Wilks harvested the value that remained in J & M and transferred it to J & M Marine with no regard to the independent corporate identity of J & M.  Such a transition is not reflective of the action of a corporate entity; rather, it indicates an action done for the convenience and singular strategy of the principal, Wilks.

73.      In 2007, Wilks put J & M into dormancy.  This purported change of corporate status was, upon information and belief, done without any formal shareholder vote or board member meeting.  Further, J & M is undercapitalized; it has, according to Wilks, approximately $300,000 in debt.  Additionally, Wilks, in yet another indication of the absence of corporate

formalities between him and J & M, has represented to this Court that he intends to borrow money so that he is able to personally fund J & M's legal defense.

74.     A "Notice to Dissolve/Revoke" with respect to J & M was filed with the Mississippi Secretary of State on or about September 12, 2010, and J & M was administratively dissolved on or about December 7, 2012, according to the Mississippi Secretary of State's Business Services website.

75.     Upon information and belief, there is no independence between Wilks and J & M. J & M was simply used as the corporate entity to facilitate Wilks' personal business and that of his family.  Upon information and belief, prior to incorporating J & M in 1996, Wilks was doing exactly the same work, as the 100% owner, under a "doing/business/as" rubric.  Upon information and belief, once Wilks incorporated in 1996 there was no change to the company activity or purpose, and J & M certainly did not obtain an identity independent from its founder.

76.     J & M Marine, a limited liability company organized under the laws of Mississippi, is engaged in the business of recruiting and providing labor to United States companies.  Upon information and belief, J & M Marine is a mere continuation of J & M with no substantial difference in management, personnel, and corporate purpose.  As the successor corporation to J & M, it is therefore liable for any judgment entered against J & M.

77.     Upon information and belief, the primary reason that J & M Marine came into existence is because Wilks' other entity, J & M, was being sued.  To evade that litigation Wilks created J & M Marine in 2006.

78.     Once Wilks created J & M Marine, he simply shifted his employee, Nicole Homel-Tellier, from J & M over to J & M Marine.  As he had done with J & M, he listed himself

as the registered agent and his home address as the company's principal address with the Mississippi Secretary of State.

79.     Both J & M and J & M Marine share the same initials, which reference the same individuals:  John and Michael Wilks.

80.     Both corporations perform the same work:  recruit laborers to then sub-contract them out to other companies for a profit.  Given both entities were in the same business and both operated out of the same address, it is likely that whatever assets were held by J & M (e.g. computers, printers) were at the disposal of J & M Marine both during the time that both companies existed and also once J & M was put into dormancy.

81.     Wilks moved the recruited laborers from J & M, who they contracted with, over to J & M Marine.  In other words, the very revenue source of J & M became the revenue for J & M Marine.

82.     In bringing the candidates over to J & M Marine, after they had signed agreements with J & M, Wilks was unequivocally holding J & M Marine out, as the successor company of J & M.  Further, this transition of recruited laborers, in conjunction with avoiding the litigation then pending against J & M, exemplifies the taking of the benefits of the predecessor company while leaving its liabilities behind.  Wilks acknowledges that J & M has a $100,000 judgment against it, an obvious liability that has not tracked across to J & M Marine.

83.     Throughout this complaint, plaintiffs refer to J & M, Wilks and J & M Marine collectively as "Labor Broker Defendants."

*All Defendants*

84.     At all relevant times, Dewan, Dewan Consultants, Global, Burnett, Burnett Law Offices and GCILC acted as agents of Signal, Indo-Amerisoft and/or J & M, for the purposes of

recruiting, obtaining, contracting, transportation and/or providing plaintiffs for labor or services (except that Global did not recruit for Indo-Amerisoft or Rao).

85.     Individually and through their agents, associates, attorneys, and/or employees, all defendants have contacts with New Orleans, Louisiana.

86.     At all relevant times, defendants were "persons" within that term as defined by RICO, 18 U.S.C. § 1961(3).

87.     Upon information and belief, defendants have been engaged in contacts with plaintiffs, including recruiting, obtaining, labor contracting, providing immigration-related services to, transporting, harboring, providing and/or employing plaintiffs.

88.     At all relevant times, defendants operated enterprises engaged in interstate commerce or in the production of goods for interstate commerce.

## STATEMENT OF FACTS

### The Recruitment Process

Recruitment of the Group I Plaintiffs

89.     Beginning in late 2003 and continuing through at least 2006, Recruiter Defendants placed ads in various newspapers across India and the United Arab Emirates, seeking welders, fitters, and other marine fabrication workers on behalf of various U.S.-based companies and individuals, including Labor Broker Defendants, Indo-Amerisoft and Kurella Rao.[2]

---

[2]     As set forth in paragraph 84, Global did not recruit for Indo-Amerisoft or Rao.  As such, on information and belief, Global did not communicate with plaintiffs Prajapati, Narayanannair, Baby, Joseph, Jackson, Nair, or Indo-Amerisoft and Rao until the initial steps of the recruitment process for Signal began.  On information and belief, Global did not take money from plaintiffs Prajapati, Narayanannair, Baby, Joseph, Jackson, or Nair until approximately that same time.  For the purpose of this pleading, this exception is incorporated by reference into paragraphs 89-118.

90.     Upon information and belief, Recruiter Defendants placed such ads in coordination and agreement with Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao.

91.     Upon information and belief, since at least December 2003 through at least mid-2004, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao frequently communicated and consulted via mail, fax, email and/or telephone communications to coordinate and direct Recruiter Defendants' activities, including advertising efforts on behalf of Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao.

92.     The advertisements placed by Recruiter Defendants promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States.

93.     In response to these advertisements, Plaintiffs Kantibhai Khemabhai Prajapati, Reghunadhan Palachuvattilputhenpura Narayanannair, Zakir Husain Ghulam Husain, Gogy Joseph, Davis Antony, Joshy Kaiprampattu Joseph, Antoney Tharayil Xavier, Philip Pindakadavil George, Yacob Thachil Varghese, Mathew Jackson, and Sivakumar Ramakrishnan Nair (hereinafter "Group I Plaintiffs") contacted Recruiter Defendants by telephone, and/or attended meetings and testing sessions organized by Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, Kurella Rao, and their agents, employees and/or representatives at several locations throughout India and the United Arab Emirates.

94.     Specific facts relevant to the experiences of plaintiffs, including Group I Plaintiffs, are set forth in the chart attached to this Complaint as Exhibit 1 ("RICO Fraud Chart"), which is incorporated herein by reference.

95.     Upon information and belief, prior to attending these meetings and testing sessions, Labor Broker Defendants, Indo-Amerisoft, Kurella Rao, Recruiter Defendants, and Legal Facilitator Defendants conferred in late 2003 and early 2004 by phone, mail, fax and or email to organize, plan, and coordinate the logistics and substantive content of these meetings and testing sessions.

96.     In telephone communications, in-person meetings, faxes, contracts, and other written documents transmitted by mail and/or wire in the first half of 2004, Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft personally and through employees, agents and/or associates, told Group I Plaintiffs that if Group I Plaintiffs successfully passed skills tests administered in the United Arab Emirates or India and paid fees totaling approximately 5 to 8 lakh[3] rupees (approximately $12,000 to $20,000), then Group I Plaintiffs would be able to apply for permanent resident (green card) status in the United States with Labor Broker Defendants, Indo-Amerisoft and Kurella Rao.

97.     Upon information and belief, all statements the Recruiter Defendants and the Legal Facilitator Defendants made to plaintiffs in the course of recruiting plaintiffs for J & M were within the scope of the agency agreements between Defendant J & M and Recruiter Defendants and Legal Facilitator Defendants.

98.     In telephone communications, in-person meetings, faxes, written agreements, and/or other written communications, transmitted, upon information and belief, by mail and/or wire in the first half of 2004, Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft told Group I Plaintiffs that the total fees to work for the Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao had to be paid in a series of approximately three

---

[3]     A "lakh" is a term used in India to refer to one hundred thousand of any item, thus 5 "lakh" rupees would be the equivalent of 500,000 rupees.

installments.   Group I Plaintiffs signed agreements with Legal Facilitator Defendants for the Legal Facilitator Defendants to become their lawyers for immigration applications.

99.     In these conversations in the first half of 2004, Group I Plaintiffs were informed on several occasions by Recruiter Defendants and/or Legal Facilitator Defendants that after obtaining their permanent residency, they would be able to obtain legal permanent residence for their spouses and children.

100.    At informational meetings and in telephone conversations, faxes, agreements, and other written documents transmitted in late 2003 through approximately mid-2004, Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft, personally and/or through their agents, representatives, and/or employees, represented to Group I Plaintiffs that Labor Broker Defendants were stable and reputable U.S. companies offering lawful and ample employment opportunities

101.    Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft, personally and/or through their agents, representatives, and/or employees, further represented that Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao would obtain for Group I Plaintiffs green cards enabling Group I Plaintiffs to permanently and legally immigrate to the United States with their family members.

102.    At informational meetings and in telephone conversations, faxes, agreements, and other written documents transmitted in late 2003 through approximately mid-2004, the Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents, employees and/or representatives, told Group I Plaintiffs that the green card process, once commenced, would be completed within 18 to 24 months.

103.    In such communications with plaintiffs, Recruiter Defendants, Legal Facilitator Defendants, and Kurella Rao and Indo-Amerisoft further promised to act diligently and do everything necessary to obtain green cards for employment with Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao for Group I Plaintiffs in the timelines stipulated.

104.    Based on these and other promises made to them regarding green cards and work opportunities in the United States, Group I Plaintiffs signed agreements (hereinafter "the green card agreements") at various times in early to mid-2004 with Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao.

105.    Agreements signed by plaintiffs and other documents provided to the Group I Plaintiffs by Legal Facilitator Defendants, Recruiter Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents, representatives, and/or employees, through the use of mail and/or wire transmissions in and around early to mid-2004, further promised that Group I Plaintiffs would promptly receive a refund of all or nearly all of their payments if these defendants, Indo-Amerisoft, and/or Kurella Rao, did not succeed in securing green cards for Group I Plaintiffs as promised.

106.    Legal Facilitator Defendants, Recruiter Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, knew or should have known that they and/or their agents would not refund Group I Plaintiffs' money as promised in written agreements and other documents.

107.    Legal Facilitator Defendants, Recruiter Defendants Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao, personally and/or through their agents, representatives, and/or employees, induced the Group I Plaintiffs to enter into the green card agreements without intent to diligently pursue Group I Plaintiffs' green card applications.

108.   Legal Facilitator Defendants, Recruiter Defendants Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents, representatives, and/or employees, knowingly represented without any basis whatsoever, inter alia, that the companies and/or entities purportedly sponsoring Group I Plaintiffs' applications were financially solvent and had reliable and stable employment opportunities to provide Group I Plaintiffs.

109.   Legal Facilitator Defendants, Recruiter Defendants Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents, representatives, and/or employees, knowingly represented without any basis whatsoever, inter alia, that green card applications sponsored by such companies would be valid and bona fide under U.S. immigration law and that such applications were likely to be successfully completed and approved within the promised timelines.

110.   In reasonable reliance on Legal Facilitator Defendants, Recruiter Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao's explicit and repeated promises made personally and/or through their agents, representatives, and/or employees regarding green cards, family members' ability to immigrate to the United States, and lawful and legitimate employment opportunities in the United States, Group I Plaintiffs undertook considerable economic, social, familial and personal sacrifices, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, and/or lost or unpaid wages.

111.   Group I Plaintiffs signed agreements with Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, and made the first round of installment payments required by these agreements.

112.     After Group I Plaintiffs signed agreements with Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao, and paid the first installment payments required by the agreements, these Defendants failed to provide Group I Plaintiffs with updates regarding the progress of their green card applications for extended periods of time.

113.     When Group I Plaintiffs contacted Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft by phone, mail, and/or email at various times between the last half of 2004 and mid-2006 to check on the progress of their green card applications with Labor Broker Defendants, these defendants and Indo-Amerisoft and Kurella Rao, falsely assured them that the green card process was going forward.  Defendants, Indo-Amerisoft, and/or Kurella Rao also falsely told plaintiffs that their applications had been delayed through no fault of defendants, Indo-Amerisoft, and/or Kurella Rao, but assured plaintiffs that their applications were on "fast track" processing.

114.     While awaiting the processing of their green cards, Group I Plaintiffs continued to accrue substantial interest on the money they had borrowed for the purpose of making the first installment payment to these Defendants.

115.     In or around January 2006, Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents, employees and/or representatives notified Group I Plaintiffs via telephone, email, and/or mail communications that the labor certification required for their green card applications had been approved by the U.S. government.

116.     After this notification, Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, personally and/or through their agents,

representatives, and/or employees, used wire and/or mail communications to collect the second and/or third installment payments from the Group I Plaintiffs.

117.    By spring 2006, after the 18 to 24 month processing period promised by Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, and/or their agents had elapsed, the Group I Plaintiffs had still not received their green cards.

118.    By spring of 2006, Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, and/or their agents had yet to refund Group I Plaintiffs' payments as promised by plaintiffs' green card agreements.

Signal Joins the Fraudulent Enterprise and Contracts to Bring Workers to the United States

119.    After the devastation caused by Hurricane Katrina in 2005, Signal had significant potential for new work fixing damaged oil rigs, ships, and other marine platforms.  At the same time, however, Signal management hoped to avoid using higher-cost United States-based contract labor for this work.

120.    In early 2006, Global approached Signal with a potential solution to its problem. At a meeting in January or February of 2006, Global told Signal's Chief Financial Officer Chris Cunningham, Senior Vice President and General Manager Ronald Schnoor, and Vice President of Productions for Mississippi Operations Bill Bingle, that it could deliver first-class fitters and welders from India at no cost to Signal.  Global informed Signal that it would work with Burnett and Dewan to bring skilled laborers from India.  The workers themselves would pay for all costs and fees associated with the recruitment process, immigration processing, and travel to the United States, and Signal would not reimburse the workers for these fees.

121.   On April 18, 2006, Signal formally joined the defendants' scheme, executing a document entitled "Skilled Worker Recruitment Agreement" (the "Recruitment Agreement") with Global, authorizing Global to recruit foreign skilled workers for employment at Signal "under the 'H-2B' temporary program and/or the 'permanent residence' process." Pursuant to the Recruitment Agreement, Global agreed to deliver the workers "at no cost to Signal" and further agreed that all other charges, expenses and fees associated with recruitment, transportation, and entry of the foreign workers into the United States would be paid by the workers themselves or by Global, who in turn would be reimbursed through deductions from the wages of Plaintiffs and other workers.

122.   On June 19, 2006, Signal executed a power of attorney appointing Dewan Consultants as Signal's "representative in India to facilitate the recruitment of skilled workers to the United States of America" for employment at Signal.   The power of attorney authorized Dewan Consultants to advertise, conduct seminars and trade tests, and sign any necessary legal documentation on Signal's behalf.

123.   Also in mid-2006, Signal entered into an attorney-client relationship with the Legal Facilitator Defendants to advise Signal on immigration issues pertaining to Signal's need for workers.   The Legal Facilitator Defendants never disclosed the conflict of interest that he was working on behalf of both plaintiffs, and Signal, to plaintiffs.   Signal and the Legal Facilitator Defendants later memorialized their engagement in a written retainer agreement.   Pursuant to that agreement, Signal would not be responsible for any of the Legal Facilitator Defendants' legal fees. Rather, under the terms of the agreement, the Legal Facilitator Defendants took funds from the "recruitment fees" charged to the workers to pay for the legal services provided to Signal.

124.    Signal requested that the Recruiter Defendants and Legal Facilitator Defendants secure foreign workers and transport them to the United States as quickly as possible.  Signal and the Recruiter Defendants and Legal Facilitator Defendants decided that Signal would sponsor workers on H-2B visas, which could later be extended if Signal needed more foreign labor.

125.    In 2006, the Recruiter Defendants placed newspaper advertisements in at least six Indian cities to recruit workers for Signal.  Some of the advertisements offered welders and fitters opportunities to go to the United States and obtain H-2B visas or green cards.   Other advertisements touted the opportunity for "permanent lifetime settlement in U.S.A. for self and family."

126.    Upon information and belief, in the course of telephone, fax, email and/or mail communications occurring in or around May or June 2006, Signal authorized Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill the anticipated H-2B guestworker jobs at Signal operations.

127.    Upon information and belief, in the course of these communications, Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to represent that Signal would assume sponsorship of the pending and as-yet-unsuccessful green card applications on behalf of, among others, Group I Plaintiffs.

128.    Upon information and belief, in the course of these communications, Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to represent that Signal would apply for at least two to three H-2B visa extensions on behalf of all the Indian H-2B workers, including plaintiffs, to allow them to remain in the United States working for Signal while plaintiffs' green card applications were simultaneously being processed.

129.     Upon information and belief, Signal authorized its agents to make these representations even though it knew or had reason to know that such H-2B guestworker visa extensions and simultaneous green card applications would not be bona fide and valid under United States immigration law.   Moreover, Signal authorized its agents to make these misrepresentations even though it did not have the intention at that time to apply for such visa extensions and/or green cards on behalf of plaintiffs or the other Indian H-2B workers.

130.     In July and August of 2006, with specific dates and assertions as set out in Exhibit 1, the Legal Facilitator Defendants on behalf of Signal filed with the United States Citizenship and Immigration Service by mail, electronic transmission, and/or fax the completed I-129 forms and attachments seeking 590 H-2B visas.

131.     Knowing that Signal's labor need was projected to be at least two to three years, in these H-2B visa applications Signal attested to a 10-month labor need running from October 1, 2006 – July 31, 2007.  Signal falsely represented to the United States government that at the end of this 10 month period, it intended to return all H-2B beneficiaries back to India. The Legal Facilitator Defendants declared that the applications were based on all information of which Burnett had any knowledge despite the fact that the Legal Facilitator Defendants believed that Signal's labor need for these workers exceeded ten months.

132.     In late May and early June of 2006, the Legal Facilitator Defendants, on behalf of Signal, filed with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor by mail, electronic transmission, and/or fax the completed forms ETA 750 and attachments seeking permission to import and hire 590 foreign guestworkers under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant

regulations 8 C.F.R. § 214.2(h)(6) and 20 C.F.R. § 655.3, and associated administrative letters and/or guidance (commonly known as "the H-2B guestworker program").

133.   Knowing that Signal's labor need was projected to be at least two to three years, the Legal Facilitator Defendants and Signal stated in these applications to the state workforce commissions and forms ETA 750 that Signal would employ workers from October 1, 2006 to July 31, 2007.  These applications to the United States government and the state governments of Mississippi and Texas were furnished with signatures by Signal executives swearing, under pain of perjury, to the veracity of the information in these applications.

134.   Signal sought these workers to perform various jobs essential to its marine fabrication services business, including welding and fitting.

135.   The H-2B guestworker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs when employers attest that they cannot find U.S. workers to perform the available jobs.

136.   H-2B visas are nonimmigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.

137.   Signal stated in the ETA 750 forms that its need for H-2B guestworkers was "peak load and a one-time occurrence" and that "the temporary workers will work for the length of the prescribed dates of need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

138.   In the ETA 750 forms, Signal named Legal Facilitator Defendants as its agents for the purposes of preparing and submitting these applications to import H-2B guestworkers. Legal Facilitator Defendants prepared and submitted these applications on behalf of Signal.

139.    At the time of filing the ETA 750 forms and attachments with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor, Signal and the Legal Facilitator Defendants knew that Signal projected the labor need that it sought to fill with foreign workers to be at least two to three years.

140.    Signal and Legal Facilitator Defendants, at or around the time they filed the ETA 750 forms in May and June 2006, repeatedly communicated by telephone, mail, email, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.   Upon information and belief, Signal and/or Legal Facilitator Defendants repeatedly communicated with Recruiter Defendants by telephone, mail, email, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.

<u>Group I Plaintiffs Are Recruited for Signal</u>

141.    In spring and summer of 2006, Group I Plaintiffs who had already initiated the green card process spoke with Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft over the phone and in person regarding their long-pending green card applications with Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao.

142.    In these communications, Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft offered Group I Plaintiffs the opportunity to pursue their green cards under the sponsorship of Signal.

143.    Upon information and belief, Global and Kurella Rao and Indo-Amerisoft agreed that Global would take over the recruitment process started by Rao if Rao paid Global a substantial portion of the recruitment fees he had collected from Indian workers, in the first and second installment payments.

144.     On information and belief, Rao paid to Global the collected recruitment fees, and Global began communicating with former Rao recruits.

145.     Recruiter Defendants and Legal Facilitator Defendants falsely assured Group I Plaintiffs that Signal would seek at least two extensions of the temporary H-2B visas with which plaintiffs would gain admittance to the United States, and that plaintiffs' H-2B visas would thereafter be converted to permanent green cards.

146.     Upon information and belief, prior to these communications with Group I Plaintiffs, Recruiter Defendants, Legal Facilitator Defendants, and Signal communicated and consulted frequently via mail, fax, email and/or telephone communications regarding the issues to be discussed and representations to be made to Group I Plaintiffs.

147.     In their communications with Group I Plaintiffs, Recruiter Defendants and Legal Facilitator Defendants further failed to disclose material facts regarding the H-2B visas, including the fact that H-2B visas confer only a temporary nonimmigrant status which does not allow the bearer to adjust to permanent residency status and the fact that applying for H-2B visa status is fundamentally incompatible with simultaneously applying for a green card.

148.    Group I Plaintiffs, unaware of U.S. immigration law and the temporary, nonimmigrant character of H-2B visas and desperate not to forfeit the substantial fees that they had already paid, agreed, in reliance on the representations of Recruiter Defendants, Legal Facilitator Defendants, and/or Kurella Rao and Indo-Amerisoft, to transfer their green card applications to Signal's sponsorship and further agreed to work for Defendant Signal under H-2B visas pursuant to the terms explained by Recruiter Defendants and Legal Facilitator Defendants.

149.    In reliance on the representations of Recruiter Defendants, Legal Facilitator Defendants, and Signal, Group I Plaintiffs entered the United States on H-2B guestworker visas in late 2006 and early 2007 for the purposes of working for Defendant Signal at its Pascagoula, Mississippi and Orange, Texas facilities.

150.    Group I Plaintiffs would not have paid the extraordinary fees charged by Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft, and/or Kurella Rao, for travel, green cards, visas, and work opportunities had they known that these defendants, Indo-Amerisoft, and/or Kurella Rao's promises and representations, as more particularly described above in paragraphs 89-149, were false.

151.    Group I Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Brokers Defendants for travel, green cards, visas, and employment opportunities had they known that these defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

<u>Recruitment of the Group II Plaintiffs</u>

152.    At the same time Signal was recruiting Group I Plaintiffs, who had previously been recruited to work for the Labor Broker Defendants and/or Indo-Amerisoft, Signal, working with its agents the Recruiter Defendants and Legal Facilitator Defendants, began advertising for and recruiting additional individuals to work for Signal in the United States.  From 2006 through at least 2007, Dewan, Global, Indo-Amerisoft and Burnett (acting as agents for Signal) placed advertisements in newspapers throughout India and the United Arab Emirates to recruit welders, fitters and other workers for Signal.  Some of the advertisements offered opportunities to go to the United States and obtain H-2B visas or "permanent employment visas."  Others promised green

cards within a year.  Plaintiffs either saw these advertisements themselves or were told of the advertised opportunities by family or friends.

153.     These advertisements and other recruiting efforts were undertaken on behalf of, at the direction of, and/or in coordination and consultation with Signal and Burnett.

154.     In response to the advertisements, Plaintiffs Ravi Thammina, George Kutty Puthiya Parampil Thomas, Sunny Cherian, Babu Karippai Ouseph, Assari Krishnan Thankappan, Rajan Pazhambalakode, Venkatarao Buridi, Baiju Paul, Sarma Venkata Satyanarayana Bhiri, Bhaskararao Nimmadala, Ganapathi Rao Akkireddi, Satyanarayana Vangapandu, Srinu Kalla, and Maheshwara Rao Molletti (collectively, "Group II Plaintiffs") contacted Dewan, Global and Indo-Amerisoft through 2006 and 2007 by telephone and at in-person meetings.

155.     Specific facts relevant to the experiences of plaintiffs, including Group II Plaintiffs, are set forth in the chart attached to this Complaint as Exhibit 1, which is incorporated herein by reference.

156.     Upon information and belief, Signal's direction of and coordination of Recruiter Defendants' and Legal Facilitator Defendants' recruitment efforts was effectuated by the use of numerous telephone, fax, email, and/or mail communications occurring from Spring of 2006 through at least January 2007.

157.     In these communications Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to act as their agents for the purposes of recruiting and providing Indian welders and fitters to fill anticipated H-2B guestworker jobs at Signal operations.

158.     In these communications, Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to falsely represent that Signal would agree to sponsor bona fide green card applications for the Group II Plaintiffs and obtain at least two H-2B visa extensions on

behalf of Group II Plaintiffs to allow them to remain in the United States working for Signal while their green card applications were being processed.

159.     Signal authorized these representations even though it knew or had reason to know that such visa extensions and green card applications would not be bona fide, valid, or lawful under United States immigration law and even though Signal did not have the intention at that time to apply for visa extensions and/or green cards on behalf of all the Indian H-22B workers, including Group II Plaintiffs.

160.     Throughout 2006 and 2007, Group II Plaintiffs attended meetings in India and the United Arab Emirates at which Dewan, Pol and Burnett, acting on Signal's behalf, informed Group II Plaintiffs of the opportunity to work for Signal.

161.     Several Signal employees attended these meetings.

162.     At these meetings and in communications effected by wire and mail during this time period, Dewan, Pol and Burnett told Group II Plaintiffs that Signal was a U.S. Company offering employment opportunities in the United States on H-2B visas, and that Signal would extend those visas while sponsoring their applications for permanent residence (green cards).

163.     In exchange, Group II Plaintiffs would have to pass trade tests and pay fees totaling approximately 5 to 12 lakh rupees (about $10,000-$25,000) in approximately three installments.

164.     Group II Plaintiffs were further informed by Dewan, Pol, and/or Burnett that they would be able to obtain legal permanent residence for their families.

165.     Upon information and belief, prior to attending these meetings and testing sessions, Dewan, Global, and Burnett conferred in 2006 and 2007 by phone, mail, fax and/or email to organize, plan, and coordinate the logistics and substantive content of these meetings.

166.    Dewan, Global, and Burnett traveled across state and international lines to attend meetings with Group II Plaintiffs in India and the United Arab Emirates in 2006 and 2007.

167.    At informational meetings and in telephone conversations, written agreements, and other written documents transmitted through the use of mail and wire communications occurring in 2006 and 2007, Dewan, Global, and Burnett personally and/or through their agents, representatives, and/or employees, represented to Group II Plaintiffs that Signal would provide lawful, stable, and ample employment opportunities, that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal, and that Signal would obtain work-authorized green cards for Group II Plaintiffs, enabling the Group II Plaintiffs to permanently and legally reside in the United States with their families.  Group II Plaintiffs signed agreements with Legal Facilitator Defendants for the Legal Facilitator Defendants to become their lawyers for immigration applications.

168.    In such communications with Group II Plaintiffs, Dewan, Global, and Burnett further promised to act diligently and do everything necessary to ensure that Plaintiffs obtain green cards within two years of arriving in the United States.

169.    Such representations and promises were within the scope of the agency agreements between Signal and Dewan, Global, and Burnett.

170.    Reasonably relying on these and other promises made to them regarding green cards and work opportunities in the United States, Group II Plaintiffs signed written agreements at various points in 2006 and 2007 with Dewan, Global, and Burnett.

171.    In those agreements, Group II Plaintiffs promised to pay the fees charged by Dewan, Global, and Burnett.  These defendants knew that these fees would cause Group II Plaintiffs to incur substantial and potentially ruinous debt.

172.    Written agreements between plaintiffs and Recruiter Defendants and Legal Facilitator Defendants also promised assistance in applying for and securing green cards—which the Recruiter Defendants and the Legal Facilitator Defendants ultimately never provided.  Dewan Consultants, for example, had some plaintiffs sign memoranda of understanding which informed plaintiffs that "Signal . . . has orally promised [Dewan Consultants] . . . that . . . [Signal] will be willing to file and process their employment base [sic] Green Card."  Dewan Consultants also issued form letters to some plaintiffs, which stated that Signal "shall proceed with your Employment Based Permanent Residence visa for [the] United States of America."  The Law Office of Malvern C. Burnett issued an "Attorney Service Agreement" providing that Burnett "will . . . file all necessary documents with the government to assist the Worker make an application for the permanent resident (green card) program."   Similarly, Global issued a "Services Agreement" promising some plaintiffs that Global would do "everything within its power to assist worked to obtain permanent residence status in the United States within 24 months.

173.    At meetings and in telephone conversations, written agreements and other documents provided to Group II Plaintiffs through the use of mail and/or wire transmissions in and around 2006 and 2007, Dewan Global, and Burnett further promised that Group II Plaintiffs would receive a refund of all or substantially all of their payments if Group II Plaintiffs did not receive the promised green cards.

174.    Dewan, Global, and Burnett knew or should have known that they would not refund Group II Plaintiffs' payments as promised and, in breach of applicable agreements, refused to refund Group II Plaintiffs' payments upon request.

175.     In reasonable reliance on explicit and repeated promises by Dewan, Global, and Burnett regarding green cards and employment opportunities in the United States, Group II Plaintiffs undertook considerable economic, personal and familial sacrifices, in order to amass the funds demanded by defendants for recruitment and travel to the United States, and to initiate the green card process with Signal.

176.     These sacrifices included the mortgaging and/or sale of personal property and the assumption of significant interest-bearing debt.

177.     In reasonable reliance on promises by Dewan, Global, and Burnett of high-paying employment and permanent residency in the United States, Group II Plaintiffs relinquished stable employment opportunities in India and as guest workers in the United Arab Emirates, Saudi Arabia and Africa.

178.     In reasonable reliance on the promises by Dewan, Global, and Burnett, Group II Plaintiffs signed written agreements with these Defendants and made the payments required by these agreements.

179.     Dewan, Global, and Burnett induced Group II Plaintiffs to enter the agreements without intending to diligently pursue Group II Plaintiffs' applications and without any basis whatsoever for representing, inter alia, that Signal had lawful long-term employment opportunities to provide Group II Plaintiffs; that Signal could legally apply for numerous H-2B visa extensions to maintain Group II Plaintiffs' presence in the United States; that working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; that green card applications sponsored by Signal would be valid and bona fide under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

180.     Dewan, Global Resources, and Burnett knew plaintiffs would rely, and intended to cause plaintiffs to rely, on these misrepresentations as well as other misrepresentations and/or omissions described herein.

181.     Signal authorized its agents to make these misrepresentations even though it knew and had reason to know that such visa extensions and green card applications would not have been valid and bona fide under U.S. immigration law, and even though it did not intend to apply for such visa extensions or green cards on behalf of plaintiffs and the other Indian H-2B workers.

182.     Group II Plaintiffs would not have paid the extraordinary fees charged by Dewan, Global Resources, and Burnett for green cards, visas, and employment opportunities had they known that these defendants' promises and representations were false.

183.     Group II Plaintiffs would not have paid the extraordinary fees charged by Dewan, Global Resources, and Burnett for green cards, visas, and employment opportunities had they known that these defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

<u>Signal Further Breached Its Agreements with Certain Plaintiffs</u>

184.     Plaintiffs incorporate by reference the recruitment allegations concerning Group I and Group II Plaintiffs for the recruitment of the Abandoned Plaintiffs, as defined below.

185.     In early- to mid- 2007, Shanoj Joseph, Saji Chettiyara Baby, Subranarayanan Karuppiah, Joseph Thomas Kanjiraparambil and David Raju Tuloori (collectively, "Abandoned Plaintiffs") each arrived in the United States on H-2B visas received through the recruitment process in order to work at Signal.

186.    Abandoned Plaintiffs relied on explicit promises and agreements, expecting to work at Signal upon arrival in the United States.  But for these explicit promises and agreements, the Abandoned Plaintiffs would not have spent significant funds to obtain a green card and/or travel to the United States for work.

187.    No one from Signal met the Abandoned Plaintiffs at the airport when they arrived in the United States, as assured by Dewan.  Rather, when Abandoned Plaintiffs contacted Signal offices upon arrival, they were told that despite their offer letters, agreements and visas, their job offers were rescinded.

188.    In breach of explicit promises and applicable agreements, and despite obtaining H-2B visas specifically to work at Signal, and despite the Abandoned Plaintiffs having spent an enormous amount of money on recruitment and other fees, relinquishing other valuable job opportunities, and having travelled to the United States to work for Signal, Signal failed to provide Abandoned Plaintiffs with employment opportunities or green cards in the United States.

189.    As a result of Signal's breach, Abandoned Plaintiffs were abandoned in the United States and were unable to legally work for any other employers.

<u>Preparations and Departure for the United States</u>

190.    In 2006, Signal's employees and agents traveled to various locations in India and the United Arab Emirates to interview and to test the worker recruits.  In particular, in anticipation of employing them in the United States, Signal's employees and agents tested plaintiffs' welding and pipefitting skills.

191.    Plaintiffs paid costs necessary to travel to the cities where these tests were held.

192.    Signal often charged admission fees to take these tests.

193.     Plaintiffs attended and passed these tests, which were overseen and graded by Signal's, and/or Dewan's agents, employees, and/or representatives.

194.     On information and belief, prior to attending these meetings and testing sessions, Signal, Recruiter Defendants, and Legal Facilitator Defendants conferred in spring, summer, and fall 2006 by phone, mail, fax and/or email to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

195.     On or about July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's labor certification applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

196.     In approving these labor certification applications, the United States Department of Labor relied on the accuracy of the applications' stated 10-month period of labor need.

197.     On information and belief, the Department of Labor is prohibited by its internal guidelines to grant labor certification applications without relying on the application's statement of temporary labor need.

198.     In late August and early September 2006, the United States Citizenship and Immigration Service approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

199.     In approving these visa petitions, the United States Citizenship and Immigration Service relied on the accuracy of the petitions' stated 10-month period of labor need and the representation that Signal's need was based on a one time peak-load temporary demand.

200.     The United States Citizenship and Immigration Service must, according to regulation, rely on the stated period of the petitioner's labor need.  See 8 C.F.R.214.2(h)(6)(ii)(B) (2006).

201.     Signal, Recruiter Defendants, and Legal Facilitator Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas was inconsistent with Signal's projected actual labor need and therefore defendants knew these statements to the government were false.

202.     The Recruiter Defendants and the Legal Facilitator Defendants used the H-2B visas, obtained from the United States Government on the basis of false statements by Signal and the Legal Facilitator Defendants, to elicit payments of the second and/or third installment from plaintiffs and other Indian H-2B workers.

203.     Plaintiffs entered the United States on H-2B guestworker visas issued by the United States Government on the basis of false statements made by Signal, Recruiter Defendants, and the Legal Facilitator Defendants in late 2006 and early 2007 for the purposes of working for Signal at its Pascagoula, Mississippi and Orange, Texas facilities.

204.     From the beginning of the recruitment process, Signal, the Legal Facilitator Defendants, and the Recruiter Defendants represented to plaintiffs and/or by omission caused plaintiffs to believe that Signal would process the green card applications either concurrently or after the H-2B applications.

205.     Plaintiffs relied on these representations and omissions when they made installment payments on their recruitment fees.  But for these representations and omissions, plaintiffs would not have paid these fees.

206.     Signal, the Legal Facilitator Defendants, and the Recruiter Defendants did not process green card applications concurrently with the H-2B applications.  These defendants did not submit green card applications until after plaintiffs already were in the United States, if at all. Defendants' representations to the contrary were false when made.

207.    Around the time of United States Citizenship and Immigration Service's visa approval, plaintiffs made necessary preparations in order to travel to the United States on H-2B visas to work for Signal, including paying to obtain necessary travel and legal documents; making payments to the United States consulate, Recruiter Defendants and Legal Facilitator Defendants for mandatory H-2B visa and consular processing fees; attending H-2B visa interviews; and paying Recruiter Defendants for travel arrangements.

208.    In order to secure H-2B visas to work for Signal, plaintiffs were required to be interviewed by United States Consular offices in Indian cities.

209.    In order to attend these consular interviews, plaintiffs had to pay the costs of travel from their homes or places of employment to various large Indian cities including Chennai (Madras) and Mumbai (Bombay).

210.    Recruiter Defendants and/or Legal Facilitator Defendants, acting as Signal's agents, required that plaintiffs meet with Recruiter Defendants and/or the Legal Facilitator Defendants in these Indian cities prior to attending their consular interviews.

211.    On information and belief, prior to these meetings, Recruiter Defendants and Legal Facilitator Defendants discussed amongst themselves and with Signal by email, telephone, or in-person communications, the topics to be discussed and instructions to be given to plaintiffs at these meetings.

212.    At these pre-interview meetings, Recruiter Defendants and Legal Facilitator Defendants ensured that plaintiffs were up-to-date on paying the fee installments required by their green card agreements.

213.    On information and belief, Recruiter Defendants and/or Legal Facilitator Defendants required that plaintiffs sign documents permitting defendant Sachin Dewan to receive their visa-stamped passports from the Consulate on plaintiffs' behalves.

214.    Recruiter Defendants and/or Legal Facilitator Defendants also coached the plaintiffs on what to say during consular interviews.  In particular, Recruiter Defendants and/or Legal Facilitator Defendants told plaintiffs not to discuss plaintiffs' payment of monies in order to participate in the process to work in the United States for Signal.

215.    Recruiter Defendants and/or Legal Facilitator Defendants also told plaintiffs not to mention defendants' promise of a green card in exchange for the money they paid to defendants.

216.    Recruiter Defendants and/or Legal Facilitator Defendants told plaintiffs that if they did not follow these instructions regarding the interviews, plaintiffs would not receive their visas and would forfeit all monies they had previously paid to defendants, in addition to losing their opportunity to permanently immigrate to the United States.

217.    During plaintiffs' consular interviews, the consular officials took plaintiffs' passports from them.

218.    Once plaintiffs' visas were approved, consular officials sent plaintiffs' passports with H-2B visas affixed, directly to Dewan.

219.    After receiving word that plaintiffs' visas were approved, Recruiter Defendants made travel arrangements for plaintiffs' departures to the United States.

220.    Before plaintiffs could leave for the United States, however, plaintiffs were required to attend final meetings in Recruiter Defendants' Mumbai (Bombay) office.

221.     Such meetings typically took place mere hours before plaintiffs' scheduled departures to the United States, when Recruiter Defendants' office was filled with anxious Indian H-2B workers waiting to travel to the United States.

222.     At these meetings, Recruiter Defendants collected the final installment payments required by plaintiffs' green card agreements.

223.     Recruiter Defendants also required that plaintiffs, virtually all of whom did not proficiently read or speak English, sign English language documents with little or no time for review.

224.     Recruiter Defendants refused to return plaintiffs' passports – which had been in Dewan's possession since after plaintiffs' H-2B visas were approved by Consular Officials – until after plaintiffs had paid the final installments and signed the mandatory paperwork.

225.     In forceful tones, Recruiter Defendants or their staff demanded that plaintiffs quickly sign the mandatory documents, lest they miss the flights to the United States which Recruiter Defendants had scheduled for them.

226.     Plaintiffs had no reasonable opportunity to translate, review, negotiate, make any changes to, or copy the documents presented them.

227.     On occasions when workers who appeared at the Mumbai office failed to present sufficient funds to pay the final installment required by the green card agreements, Dewan and his associates threatened to destroy and/or deface these workers' passports or to not allow the worker to go to the United States.

228.     Such threats were uttered in the presence of other workers, causing these workers to reasonably believe that they had no choice but to pay the final installments in full.

229.     Based on the Recruiter Defendants' threatening and coercive behavior during these pre-departure meetings in Mumbai and the extraordinary and increasing levels of debt they had incurred to pay the Recruiter Defendants and Legal Facilitator Defendants for green card and H-2B visa arrangements, plaintiffs reasonably believed that they had no choice but to make the payments required by the Recruiter Defendants and to travel to the United States to work for Signal.

230.     Plaintiffs and other Indian H-2B workers traveled from Mumbai to Signal's operations in the United States at various times from late October 2006 to approximately April 2007 on tickets arranged by the Recruiter Defendants.

The Abysmal Conditions at the Signal "Man Camps" in Pascagoula, MS and Orange, TX

231.     After arriving in the United States, plaintiffs were transported by Signal from various airports to Signal's facilities in Pascagoula, Mississippi and Orange, Texas.  Plaintiffs, who have significant experience as guestworkers in the marine fabrication industry in countries around the world, were shocked at the living conditions that Signal and its agents provided for them, particularly since they had been promised adequate accommodations.   In fact, the accommodations were far from adequate.  In addition to being guarded, they were unsanitary, isolated, and overcrowded labor camps comprised of trailer-like bunkhouses.

232.     These labor camps, or "man camps" were located in isolated, industrial areas miles removed from shopping areas, places of worship, and residential communities, and enclosed by fences and accessible only by a single guarded entrance.

233.     The labor camp gates were constantly monitored by security guards retained by Signal.

234.    Plaintiffs were not allowed to leave the camp when they pleased.  Signal's security guards monitored plaintiffs' comings and goings by requiring them to show their employee identification badges and/or recording when plaintiffs entered and/or exited the camps. Signal's security guards also searched plaintiffs' packages and bags when they entered the camps. Signal told plaintiffs and other Indian H-2B workers that if they left the camps the police could arrest them.

235.    Except on rare occasions, plaintiffs were not permitted to receive visitors in the labor camps.

236.    Up to twenty-four men were housed in each bunkhouse and made to sleep in two-tiered bunk beds.  The bunk beds were so tightly packed in the bunkhouses that it was difficult for workers to move about in the narrow passageways between bunks.

237.    Plaintiffs had little-to-no space to keep any personal items.  What little space they did have they had to keep their soiled work clothes, which caused unpleasant smells and living conditions.

238.    These housing conditions, inter alia, violated OSHA regulations.

239.    The Signal labor camp bunkhouses had insufficient toileting and bathing facilities for the amount of people who lived there, resulting in long lines for the bathrooms before and after work shifts, as well as unsanitary conditions in the bathrooms and showers.

240.    Privacy was non-existent, and plaintiffs often had extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.

241.    Signal's personnel and/or security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings.

242.     Plaintiffs took their meals in Signal's mess halls, which were only open during limited hours and were dirty and unsafe.  Due to unhygienic kitchen and living conditions, Indian H-2B Workers, including plaintiffs, often became ill.  Plaintiffs, who worked long shifts, would have to take their midday, or mid-evening meals, with them from the mess hall before leaving for their job.  By the time they were able to eat these meals, they would be ice cold and/or spoiled.  Needing the nourishment to continue working, many plaintiffs forced themselves to eat the putrid food, causing stomach or other health problems.

243.     Upon information and belief, the unhygienic condition and lack of sanitation of the man camps further violated federal, state, and/or local law including the U.S. Food and Drug Administration Food Code, as adopted and modified by Mississippi Department of Health Food Regulations and Texas Food Establishment Rules.

244.     Signal deducted labor camp fees of approximately $35 per day ($245 per week, or approximately $1,050 per month) from plaintiffs' paychecks for these substandard accommodations and meals.  Signal deducted these fees from plaintiffs' paychecks regardless of whether plaintiffs worked, including when plaintiffs were sick or injured and unable to work.

245.     When plaintiffs complained and asked to live outside the labor camps, Signal initially refused.  Subsequently, Signal told workers that they could live outside the camp if they wanted to, but Signal would still deduct the labor camp fees from plaintiffs' wages.  As a result of this economic coercion, plaintiffs reasonably felt that they had no choice but to continue living in the Signal camps.

246.     Signal only housed Indian H-2B workers such as plaintiffs in its labor camps, which non-Indian employees and management at Signal referred to as the "reservation(s)."  Upon

information and belief, workers of non-Indian descent were neither required nor allowed to live in and/or pay for accommodations in Signal's labor camps.

247.     Signal subjected plaintiffs to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and U.S. citizen workers were not similarly subjected.

248.     Plaintiffs were told that they would be fired if they committed even the slightest mistake on the job.  Indian H-2B workers would be suspended without pay for days after violating even the slightest rule.  In contrast, American workers did not face these intimidating threats and punitive actions on their job performance.

249.     Plaintiff Sunny Cherian injured himself on the job at one point, but was told he must continue working.  After insisting that he could not continue to work, he was sent back to the labor camp.  After he recovered, he was suspended without pay as punishment for refusing to work while injured.

250.     Similarly, plaintiff Assari Krishnan Thankappan became very ill and asked to go to the hospital while on the job.  His foreman rejected his request and told him to continue to work.

251.     In addition, Signal camp personnel and supervisors frequently used offensive language in speaking with and/or referring to plaintiffs and other Indian H-2B workers and regularly cursed at and insulted plaintiffs and other Indian H-2B workers on the basis of their race, national origin, and/or alienage.

252.     Signal did not reimburse plaintiffs for any of the expenses that plaintiffs and other Indian H-2B workers were required to incur as a pre-condition of seeking employment with Signal.

253.     During the first two weeks of employing plaintiffs in the United States, Signal deducted approximately $100 to $200 from their checks for job-related tool kits that they were required to purchase from Signal.

254.     Signal personnel and management regularly threatened plaintiffs and other H-2B workers that if they did not continue working for Signal, or did not work according to Signal's specifications, plaintiffs and other Indian H-2B workers would be deported back to India.

255.     In the isolated and guarded atmosphere of the labor camps and faced with constant threats, harassment, and punitive actions in addition to the crushing debts they had incurred to come to the United States, plaintiffs reasonably felt they had no choice but to continue working for Signal despite abysmal working and living conditions.

256.     At regular meetings and in one-on-one or small group conversations with Signal camp personnel and management, some workers voiced complaints regarding the discriminatory and abusive treatment to which Indian H-2B workers were subjected.

257.     When Indian H-2B workers voiced grievances regarding housing, food, and wages, Signal's personnel warned them that if they continued to complain, they would be fired and deported.

258.     When Signal took no action in response to workers' complaints, numerous Indian H-2B workers living at the Pascagoula labor camp began meeting collectively to discuss how to persuade Signal to improve conditions in its labor camps, including meeting with third parties to discuss how best to address their concerns.

259.     Signal became aware of these meetings, such as a meeting between workers and third parties whom Signal believed to be attorneys.

260.     Upon information and belief, Signal, through its employees and/or agents, contacted the Recruiter Defendants and Legal Facilitator Defendants to express its concerns about worker organizing efforts.

261.     Upon information and belief, during these conversations Recruiter Defendants, Legal Facilitator Defendants, and Signal reached an agreement regarding steps that they would take to discourage further worker organizing efforts and to ensure that the majority of the Indian H-2B workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

262.     Upon information and belief, Signal management and camp personnel conferred and planned internally and with the private security firm to respond to workers' organizing activities and to take actions to ensure that the majority of the Indian H-2B workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

263.     On or about March 7, 2007, Sachin Dewan called the wife of Sabulal Vijayan, who was one of the leaders of the workers who were collectively organizing, at her home in India and warned her that Mr. Vijayan must stop making trouble at Signal.

264.     Mr. Vijayan's wife informed Mr. Vijayan of this call, and Mr. Vijayan called Dewan on or about March 8, 2007.  During that conversation, Dewan told Mr. Vijayan that Dewan had learned from Signal that Mr. Vijayan was organizing the workers and making trouble.  Dewan told Mr. Vijayan that if the organizing continued, all the workers would be sent back to India.

265.     Mr. Vijayan informed other Indian H-2B workers about his conversation with Dewan and the call his wife had received from Dewan, and word spread quickly through the Pascagoula and Orange camps regarding the threats against Mr. Vijayan.

266.     News about the calls between Dewan, Mr. Vijayan, and Mr. Vijayan's wife substantially heightened the reasonable fears of plaintiffs in the Pascagoula and Orange camps that, if they complained about or tried to leave the discriminatory and substandard working and living conditions at Signal, the Recruiter Defendants, Legal Facilitator Defendants, and Signal would retaliate against plaintiffs or their families with acts of violence or by arranging for plaintiffs' deportation to India.

267.     Signal called a meeting with the Indian H-2B workers on or about March 8, 2007 in the Pascagoula camp, attended by Signal management and Burnett.

268.     At this meeting, Signal management told plaintiffs and other Indian H-2B workers that Signal would fight back against organizing efforts by the workers.

269.     Signal management further threatened that Signal would not extend plaintiffs' and all other Indian H-2B workers' visas if any of the workers took legal action against Signal.  At that same meeting Burnett told the workers that they were ineligible for other kinds of immigration relief and could depend only on Signal to maintain their H-2B immigration status and pursue their green card applications.

270.     At or about the same time as this camp-wide meeting in Pascagoula, Mississippi, Signal management made the decision to terminate and forcibly deport Mr. Vijayan and four other Indian H-2B workers, and to do so by means that would make an example of them for the other Indian H-2B workers in order to keep those workers in line.

271.     Early on the morning of March 9, 2007, Signal locked the gate to its Pascagoula labor camp, thereby obstructing the sole means of direct entry to and exit from the camp.

272.     Around this same time, Signal camp coordinator Darrell Snyder, and approximately five security guards, some or all of whom were obtained through a private security firm, swept through the bunkhouses carrying pictures of Mr. Vijayan and certain other workers.

273.     Security guards began accosting workers to determine whether they were the individuals shown in the pictures.

274.     Plaintiffs and other Indian H-2B workers became increasingly frightened and confused by these activities, particularly when word spread that Signal had locked the gate that served as the sole exit from the labor camp.

275.     Around 5:15 AM that morning, Mr. Vijayan was walking towards the dining area.  On his way, he saw that two of his fellow workers had been detained by security guards. When he attempted to make contact with them, a security guard denied him entry.  Subsequently, after arriving in the mess hall, a security guard and Darrell Snyder, a Signal employee, aggressively confronted Mr. Vijayan and instructed him that he was in their custody.

276.     Based upon the threats Signal executives made at the meeting on March 8, 2007, Mr. Vijayan's recent phone call with Dewan, and Mr. Vijayan's observation of security guards detaining fellow Indian H-2B workers against their will and denying himself and other workers access to them, Mr. Vijayan feared what Signal might do to him.

277.     Mr. Vijayan began to panic, thinking of the enormous quantity of money he had spent to come to the United States and the massive debts he owed in India.  Mr. Vijayan knew that he would not be able to repay such debts if he were deported and no longer employed by Signal.

278.    These feelings, combined with Mr. Vijayan's reasonable fear that Snyder and the security guards might physically hurt him, drove Mr. Vijayan to attempt suicide.  Mr. Vijayan had to be transported from the labor camp to a local hospital for immediate medical attention.

279.    Signal confined the three of the four other Indian H-2B workers it sought along with Mr. Vijayan in the communal "TV room" in the labor camp against their will.  Signal was not able to locate and confine Kuldeep Singh, the fourth Indian H-2B worker that Signal sought to deport alongside Mr. Vijayan.

280.    Confused and frightened, workers assembled outside the TV room to protest the treatment of these individuals.

281.    Around noon, Darrell Snyder and a Pascagoula police officer entered the TV room and the officer questioned why these individuals were confined to this room.  Snyder said that these workers had been fired and would be sent back to India.

282.    By early afternoon on March 9, 2007, local media, religious advocates, and other individuals had gathered outside the camp gate to express their concern over the attempted suicide of Mr. Vijayan and the forced detention of the other Indian H-2B workers.

283.    Faced with growing protests by community members and Signal employees, Signal decided not to forcibly transport the three confined Indian H-2B workers to the airport for deportation to India, and instead escorted them from the Pascagoula labor camp.

284.    The Indian H-2B workers working at Signal's Orange facilities rapidly learned of the events at the Pascagoula labor camp on March 9, 2007.

285.    Signal's actions on and after March 9, 2007 significantly intensified the reasonable fears of the remaining plaintiffs and other Indian H-2B workers in the Pascagoula and Orange camps that if they tried to leave Signal's employ or oppose unlawful and coercive

employment conditions at Signal, including by consulting with counsel, they faced the threat of physical restraint, detention, forced deportation, or other serious harms and/or abuses of the legal process.

286.     Throughout the spring and summer of 2007, Signal personnel in the Mississippi and Texas camps held various meetings with the Indian H-2B workers, including plaintiffs, to discuss the status of plaintiffs' and other Indian H-2B workers' visas and green card applications.

287.     Upon information and belief, during spring and summer 2007 Signal personnel conferred amongst themselves and with the Recruiter Defendants and the Legal Facilitator Defendants via phone and/or email to reach agreement on what should be said to workers attending the meetings.

288.     Soon after March 9, 2007, Defendant Signal held a meeting in Pascagoula with the Indian H-2B workers.  Signal personnel told the Indian H-2B workers that Signal would sponsor their green cards if they stayed at Signal and obeyed Signal's rules, and warned that if workers held any meetings against Signal's interests, they would be terminated.

289.     In that same time period, Sachin Dewan and Burnett came to the Signal camp in Mississippi and again promised, in the presence of Signal personnel, that Signal, through its attorney Burnett, would make bona fide applications for green cards and obtain several H-2B visa extensions the Indian H-2B workers.  Plaintiffs reasonably relied on these promises.

290.     In meetings and conversations in spring and summer 2007, Signal, through its agents and employees at the Pascagoula and Orange facilities, continued to promise that Signal would arrange for the H-2B visa extensions and green cards originally promised plaintiffs when they were recruited in India and the United Arab Emirates.

291.     Upon information and belief, at the same time Signal was promising to arrange for H-2B visa extensions and green cards, Signal in fact was secretly evaluating all of the Indian H-2B workers with the intent of not applying for visa extensions for certain individuals of the Indian H-2B workers.

292.     Plaintiffs' continuing dependence on Signal for their present and future immigration status, their continuing high levels of indebtedness, as well as other factors reasonably led those plaintiffs to fear serious harm and/or abuse of the legal process if they left Signal's employ.

293.     Under such circumstances, these plaintiffs reasonably felt like they had no choice but to continue working for Signal.

294.     At various times relevant to plaintiffs' claims, Signal refused to confirm whether valid H-2B visa extensions had in fact been obtained for plaintiffs, coercing plaintiffs to continue working for Signal in the hope that Signal would finally resolve their uncertain immigration status.

295.     Since first contracting with defendants in India and the United Arab Emirates, plaintiffs have yet to receive from defendants the green cards defendants promised them.  Despite clear agreements requiring them to do so, the Recruiter Defendants, the Legal Facilitator Defendants, Labor Broker Defendants, Indo-Amerisoft and/or Kurella Rao, have refused to refund any of the moneys plaintiffs paid to them and/or their agents for unsuccessful green card and visa processing.  Defendants reaped significant financial benefits from their misrepresentation, material omissions and coercive conduct, including the recruitment fees plaintiffs paid and the payments plaintiffs made for housing in Signal labor camps.

296.     As a result of its wrongful conduct, Signal also received substantial financial rewards under their agreement with plaintiffs through increased profits brought about by having a

captive work force Signal could pay significantly less than contract labor and by using the captive work force to complete projects it otherwise would not timely complete, thereby avoiding liquidated damages clauses in Signal's underlying contracts with its customers.

## CLAIMS FOR RELIEF

297.     Plaintiffs' specific claims for damages are set forth herein.

## FIRST CLAIM FOR RELIEF

THE TRAFFICKING VICTIMS PROTECTION ACT OF 2003
Forced Labor (18 U.S.C. § 1589), and trafficking with respect to
peonage, slavery, involuntary servitude, or forced labor (18 U.S.C. § 1590)[4]

***All Plaintiffs Against Defendants Signal, the Recruiter Defendants (Global Resources, Sachin Dewan, and Dewan Consultants), and the Legal Facilitator Defendants (Malvern C. Burnett, Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center)***

298.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

299.     Plaintiffs bring this claim against Signal, the Recruiter Defendants, and the Legal Facilitator Defendants.

300.     Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPA), 18 U.S.C. § 1595.

301.     Signal, Recruiter Defendants, and Legal Facilitator Defendants attempted to and did subject Group I and Group II Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.[5]

---

[4]      The statute of limitations for all of plaintiffs' claims for relief were tolled by *David et al v. Signal Int'l LLC et al*, C.A. No. 08-1220-SM-DEK (E.D. La.), and Judge Morgan's order further tolling the statute of limitations through August 28, 2013.  *See* Dkt. 1379.  Further, the statutes of limitations for various claims were also tolled by defendants fraudulent concealment of plaintiffs' right to file a cause of action.

[5]      The Abandoned Plaintiffs do not assert claims for forced labor in violation of 18 U.S.C. § 1589.

302.     Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly attempted to and did physically restrain and/or threaten Group I and Group II Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(1).

303.     Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly attempted to and did obtain the labor and services of Group I and Group II Plaintiffs using a scheme, plan, or pattern that, in the totality of the circumstances, was intended to coerce and did coerce Group I and Group II Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Signal in violation of 18 U.S.C. § 1589(2).

304.     Signal, Recruiter Defendants, and Legal Facilitator Defendants' scheme to isolate Group I and Group II Plaintiffs, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Group I and Group II Plaintiffs that they would suffer serious harm if they were to leave the employ of Signal.

305.     Signal, Recruiter Defendants, and Legal Facilitator Defendants retaliated against Group I and Group II Plaintiffs for attempts to exercise their legal rights, and threatened Group I and Group II Plaintiffs with deportation and deceived Group I and Group II Plaintiffs about the terms of their immigration status in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3).

306.     Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Group I, Group II and the Abandoned Plaintiffs so as to obtain their labor and services in violation of laws prohibiting

peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590 (TVPA).

307.    In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly recruited, transported, harbored and/or obtained the Group I, Group II and the Abandoned Plaintiffs for labor or services in furtherance of these defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

(a)    enticing, persuading, or inducing the Group I, Group II and the Abandoned plaintiffs to go on board an airliner and to go to various locations throughout the United Arab Emirates, India, and the United States, with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

(b)    knowingly and willfully holding Group I and Group II Plaintiffs to involuntary servitude, as defined by the TVPA, 22 U.S.C. § 7102(5)(a) and (b), violating 18 U.S.C. § 1584;

(c)    removing, confiscating, or possessing Group I, Group II and the Abandoned plaintiffs' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

(d)    attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, thereby violating 18 U.S.C. § 1594(a).

308.    As a proximate result of the conduct of Signal, Recruiter Defendants, and Legal Facilitator Defendants, all plaintiffs have suffered emotional injuries, injuries to their businesses and property, and other damages.

309.    Under the TVPA, plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including but not limited to:

(a)    compensation at the prevailing wage rate and all applicable overtime wages for the work done while at Signal;

(b)    damages for emotional pain and suffering, including but not limited to fright, nervousness, grief, anxiety, depression, worry, mortification, shock,

humiliation, indignity, embarrassment, panic, apprehension, terror, or ordeal experienced during the recruitment process up to the point at which each plaintiffs' employment at Signal was terminated;

(c)    compensation for all moneys paid during the recruitment process and in order to come to the United States to work for Signal, including, but not limited to:  recruitment fees; travel expenses; legal fees; medical testing; skills testing and administrative fees; losses on any personal or real property sold or pawned for the purposes of making payments in connection with the recruitment described herein; and fees and interest paid on any loans incurred as a result of the recruitment process up to the point at which each plaintiffs' employment at Signal was terminated;

(d)    compensation of deductions taken from Group I and Group II Plaintiffs' paychecks by Signal for room and board;

(e)    punitive damages; and

(f)    attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

310.    For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended. Abandoned Plaintiffs do not seek damages related to this cause of action due to events that occurred after the later of when they arrived in the United States or their job offers were rescinded by Signal.

## SECOND CLAIM FOR RELIEF

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d)

#### *All Plaintiffs Against All Defendants*[6]

311.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

---

[6]    Claims against Indo-Amerisoft and its Chairman and Director, Kurella Rao, have also been stayed pending the outcome of their bankruptcy proceedings.  Plaintiffs will seek leave to amend the complaint if and when these stays are lifted.

312.     Plaintiffs bring these claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

313.     Group I Plaintiffs, and Abandoned Plaintiffs Saji Chettiyara Baby and Shanoj Joseph, bring these claims against all Defendants, specifically:  Signal; Recruiter Defendants; the Labor Broker Defendants; and the Legal Facilitator Defendants.

314.     Group II Plaintiffs, and Abandoned Plaintiffs Subranarayanan Karuppiah, Joseph Thomas Kanjiraparambil, and David Raju Tuloori, bring these claims against:  Signal; Recruiter Defendants; and the Legal Facilitator Defendants.

315.     Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

316.     Each of the defendants is a "RICO person" within the meaning of 18 U.S.C. § 1963(1).

317.     All defendants and the United States Consular officers in India constitute an association-in-fact, and therefore an enterprise (the "RICO Enterprise I"), within the meaning of 18 U.S.C. § 1964(4).

318.     Recruiter Defendants, Legal Facilitator Defendants, and Signal are an association-in-fact, and therefore an enterprise (the "RICO Enterprise II"), within the meaning of 18 U.S.C. § 1964(4).

319.     Recruiter Defendants, Signal, Legal Facilitator Defendants, and Swetman Security are an association-in-fact, and therefore an enterprise (the "RICO Enterprise III") within the meaning of 18 U.S.C. § 1964(4).

## **The RICO Enterprises**

### RICO Enterprise I

320.     RICO Enterprise I at all relevant times was an ongoing business relationship between all defendants and the United States Consular officers in India, with the common purpose of recruiting, transporting, providing, processing, and obtaining foreign workers to work in shipyards in the United States, including in Signal's operations in Texas and Mississippi.

321.     RICO Enterprise I was engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

322.     The members of RICO Enterprise I functioned as a continuing unit.

323.     Defendants conducted or participated in, and/or conspired to conduct or participate in the affairs of RICO Enterprise I through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to recruit, obtain, transport, process, and provide workers through the use of fraudulent promises, exorbitant fees, forced labor, and/or trafficking in persons.

324.     Specifically, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

(a)     Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

(b)     Involuntary servitude in violation of 18 U.S.C. § 1584[7];

(c)     Forced labor in violation of 18 U.S.C. § 1589[8];

---

[7]     The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.

[8]     The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

(d)     Trafficking in persons with respect to modern-day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590; and

(e)     Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

(f)     Specifically, all Defendants conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

(g)     Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

(h)     Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

(i)     Immigration document fraud in violation of 18 U.S.C. § 1546.

### RICO Enterprise II

325.     RICO Enterprise II at all relevant times was an ongoing business relationship between Recruiter Defendants, Legal Facilitator Defendants, and Signal with the common purpose of selling United States green cards, visas, and work opportunities to Indian H-2B workers to convince such workers to pay fees and to travel to the United States to work for companies, including Signal.

326.     The members of RICO Enterprise II operated as a continuing unit.

327.     RICO Enterprise II is engaged in interstate commerce in that its activities and transactions relating to the sale of United States green cards, visas, and job opportunities affect interstate commerce.

328.     Recruiter Defendants, Legal Facilitator Defendants, and Signal conducted or participated in and/or conspired to conduct or participate in, the affairs of RICO Enterprise II through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to sell United States green cards and work

opportunities to Indian H-2B workers for the purposes of furnishing such workers for employment at Signal's operations.

329.    Specifically, the Recruiter Defendants, the Legal Facilitator Defendants, and Signal conducted or participated in the affairs of RICO Enterprise II by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

(a)    Enticement into modern-day slavery in violation of 18 U.S.C. § 1583;

(b)    Involuntary servitude in violation of 18 U.S.C. § 1584[9];

(c)    Forced labor in violation of 18 U.S.C. § 1589[10];

(d)    Trafficking persons with respect to modern-day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590;

(e)    Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

(f)    Mail fraud in violation of 18 U.S.C. § 1341;

(g)    Wire fraud in violation of 18 U.S.C. § 1343; and

(h)    Immigration document fraud in violation of 18 U.S.C. § 1546.

### RICO Enterprise III

330.    RICO Enterprise III at all relevant times was an ongoing business relationship between Dewan, Dewan Consultants, Global, Pol, the Burnett, Signal, Swetman Security, and M&M Bank with the common purpose of providing and maintaining a consistent and acquiescent labor force at Signal operations.

331.    RICO Enterprise III was engaged in interstate commerce in that its activities and transactions relating to maintaining and providing a consistent labor force at Signal occurred

---

[9]    The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.

[10]    The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

across state and international lines, and involve wages and working conditions at an employer engaged in interstate commerce (Signal).

332.    The members of RICO Enterprise III functioned as a continuing unit.

333.    Dewan, Dewan Consultants, Global, Pol, the Burnett, and Signal conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to maintain a consistent and acquiescent H-2B Indian labor force at Signal through the use of fraudulent promises, forced labor, and trafficking.

334.    Dewan, Dewan Consultants, Global, Pol, the Burnett, and Signal conducted or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

(a)    Enticement into modern-day slavery in violation of 18 U.S.C. § 1583;

(b)    Involuntary servitude in violation of 18 U.S.C. § 1584[11];

(c)    Forced labor in violation of 18 U.S.C. § 1589[12];

(d)    Trafficking persons with respect to modern-day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C § 1590;

(e)    Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C § 1592(a);

(f)    Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

(g)    Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

(h)    Immigration document fraud in violation of 18 U.S.C. § 1546.

---

[11]    The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.

[12]    The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

**Predicate Acts**

Enticement into Slavery:  18 U.S.C. § 1583

335.     Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of enticement into modern-day slavery in violation of 18 U.S.C. § 1583, and as set forth in Plaintiffs' First Claim for Relief, ¶ 303(a), *supra*.[13]

Involuntary Servitude:  18 U.S.C. § 1584

336.     Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of involuntary servitude in violation of 18 U.S.C. §1584, and as set forth in Plaintiffs' First Claim for Relief, ¶ 303(b), *supra*.[14]

Forced Labor:  18 U.S.C. § 1589

337.     Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal through RICO Enterprises I, II and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in Plaintiffs' First Claim for Relief, ¶¶ 297-301, *supra*.

Trafficking for the Purposes of Forced Labor and/or

Involuntary Servitude:  18 U.S.C. § 1590

338.     As set forth in the preceding paragraphs, Recruiter Defendants, Legal Facilitator Defendants, and Signal through RICO Enterprises I, III, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the

---

[13]     The Abandoned Plaintiffs do not assert enticement into slavery in violation of 18 U.S.C. §  1583.

[14]     The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. §  1584.

purposes of forced labor and/or involuntary servitude in violation of 18 U.S.C. § 1590, and as set forth in Plaintiffs' First Claim for Relief, ¶¶ 301-302, *supra*.

Document Servitude:  18 U.S.C. § 1592

339.    Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of document servitude in violation of 18 U.S.C. § 1592, and as set forth in Plaintiffs' First Claim for Relief, ¶ 303(c), *supra*.

Mail and Wire Fraud:  18 U.S.C. §§ 1341 and 1343

340.    As set forth in the preceding paragraphs and in Exhibit 1, defendants, through RICO Enterprise I, made and/or conspired to make false promises regarding green cards and other benefits in a scheme calculated to defraud plaintiffs out of large sums of money.

341.    As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Signal, through RICO Enterprises I, II, and III, made and/or conspired to make false statements related to applications submitted to the U.S. Government for H-2B visas and false promises to plaintiffs regarding green cards and other benefits in a scheme calculated to defraud plaintiffs out of large sums of money.

342.    As set forth in the preceding paragraphs and in Exhibit 1, defendants, through RICO Enterprise I, used the mails and wire communications, including communications via telephone, fax, internet and/or email, on numerous occasions to further these fraudulent schemes.

343.    As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Signal, through RICO Enterprises I, II, and III, used the mails and wire communications, including communications via telephone, fax, internet and/or email on numerous occasions to further this fraudulent scheme.

344.     These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Immigration Document Fraud:  18 U.S.C. § 1546(a)</u>

345.     As set forth in the preceding paragraphs and in Exhibit 1, defendants, through RICO Enterprise I, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to plaintiffs despite these defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

346.     As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Signal, through RICO Enterprises I, II, and III, obtained, accepted, and/or received H-2B visas despite knowing these visas to have been procured through false statements and/or fraud on the U.S. Government.

347.     As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Signal, through RICO Enterprises I, II, and III, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to plaintiffs despite these defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

348.     These willful, knowing, and intentional acts constitute immigration document fraud in violation of 18 U.S.C. § 1546(a).

**<u>Pattern of Related Racketeering Acts</u>**

349.     Defendants engaged in the racketeering activity described in this Claim repeatedly starting in 2003 and continuing at least through January 2009 with respect to approximately 590 Indian workers.

350.     Upon information and belief, Signal sought new Indian H-2B workers for employment at Signal who may be subject to similar racketeering activities, stopping this recruitment only upon the filing of this lawsuit.

351.     Defendants, through the RICO enterprises, rely on the racketeering acts described in this complaint to conduct their regular business activities.

352.     Defendants' racketeering acts have or had similar purposes:  to profit from the fraudulent recruitment and forced labor of plaintiffs and other Indian workers, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant Indian H-2B guestworker labor force at Signal's operations.

353.     Defendants' acts yielded similar results and caused similar injuries to plaintiffs, including payment of high fees, assumption of significant interest-bearing debt, and/or loss of real and personal property.

354.     As set forth in the preceding paragraphs and in Exhibit 1, the racketeering acts have or had similar participants:  the Recruiter Defendants, the Legal Facilitator Defendants, the Labor Broker Defendants, and Signal.

355.     As set forth in the preceding paragraphs and in Exhibit 1, defendants, through the RICO enterprises, directed their racketeering activities at similar victims:  Indian workers who contacted the Recruiter Defendants in search of green cards, economic opportunity, and stable employment in the United States.

356.     Defendants' acts have or had similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from plaintiffs and other Indian workers, and use of similar employment practices and policies with respect to plaintiffs and other Indian workers.

**Injury**

357.     As a direct and proximate result of defendants' willful, knowing, and intentional acts discussed in this section, plaintiffs have suffered injuries to their property and/or business, including but not limited to:  exorbitant fees paid by plaintiffs for green cards, visas and other immigration and recruitment-related services; interest on debts assumed by plaintiffs to pay such fees up to the point at which each plaintiff's employment at Signal was terminated; losses of personal and real property up to the point at which each plaintiff's employment at Signal was terminated incurred in reliance on defendants' fraudulent acts; and other pecuniary and/or losses to real or personal property up to the point at which each plaintiff's employment at Signal was terminated.

358.     Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

(a)     compensation for all moneys paid during the recruitment process and in order to come to the United States to work for Signal, including, but not limited to:  recruitment fees; travel expenses; legal fees; medical testing; skills testing and administrative fees; losses on any personal or real property sold or pawned for the purposes of making payments in connection with the recruitment described herein; and fees and interest paid on any loans incurred as a result of the recruitment process and up to the point at which each plaintiff's employment at Signal was terminated;

(b)     compensation of deductions taken from plaintiffs' paychecks by Signal for room and board;

(c)     trebling of the damages set forth in subparagraphs (a) and (b), supra; and

(d)     attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

359.     For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended. Abandoned Plaintiffs do not seek damages related to this cause of action due to events that

occurred after the later of when they arrived in the United States or their job offers were rescinded by Signal.

### THIRD CLAIM FOR RELIEF

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. § 1981

*Group I and Group II Plaintiffs Against Defendant Signal*

360.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

361.    Group I and Group II Plaintiffs assert this claim pursuant to 42 U.S.C. § 1981 damages against Signal.[15]

362.    The actions of Signal, as set forth herein, violated Group I and Group II Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Group I and Group II Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Signal.

363.    Specifically, Signal subjected Group I and Group II Plaintiffs to discriminatory and offensive mandatory room and board arrangements at Signal labor camps.

364.    Signal did not subject its non-Indian and/or U.S. citizen employees to the same or similar room and board arrangements.

365.    As set forth in the preceding paragraphs, Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian employees and/or U.S. citizens were not similarly subject.

---

[15]    The Abandoned Plaintiffs do not assert claims pursuant to 42 U.S.C. § 1981.

366.     As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Group I and Group II Plaintiffs and other Indian H-2B workers, Signal maintained an objectively hostile and abusive work environment on account of Group I and Group II Plaintiffs' race, national origin, and/or alienage.

367.     As set forth in the preceding paragraphs, Signal's discriminatory and offensive treatment of Group I and Group II Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

368.     Group I and Group II Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, national origin, and/or alienage.

369.     Signal's hostile, abusive, and discriminatory treatment of Group I and Group II Plaintiffs was unwelcome.

370.     Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Group I and Group II Plaintiffs of their rights.

371.     As a result of Signal's unlawful acts, Group I and Group II Plaintiffs have suffered injury to their property and/or persons.

372.     Group I and Group II Plaintiffs seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

> (a)     compensatory damages for the deprivation of plaintiffs' civil rights during their time in Signal's Pascagoula, Mississippi and/or Orange, Texas employment up to the point at which each plaintiff's employment at Signal was terminated;
>
> (b)     compensation for money deducted from plaintiffs' salary for the discriminatory room and board while at Signal;
>
> (c)     compensatory damages for emotional pain and suffering, including fright, nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, terror, or ordeal

experienced as a result of the deprivation of plaintiffs' civil rights, up to the point at which each plaintiff's employment at Signal was terminated;

(d)     punitive damages for Signal's malicious and reckless discriminatory conduct;

(e)     attorneys' and experts' fees and costs of this action as set forth in 42 U.S.C. § 1988(b)-(c).

373.     For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended.

## FOURTH CLAIM FOR RELIEF

### VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
42 U.S.C. § 1985 and the Thirteenth Amendment

***Group I and Group II Plaintiffs Against Defendants Signal, the Recruiter Defendants (Global Resources, Inc., Sachin Dewan and Dewan Consultants), and the Legal Facilitator Defendants (Malvern C. Burnett, Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center)***

374.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

375.     Group I and Group II Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for damages against Signal, the Recruiter Defendants, and the Legal Facilitator Defendants.[16]

376.     As set forth in the preceding paragraphs and plaintiffs' First Claim for Relief, Signal, Recruiter Defendants, and Legal Facilitator Defendants, along with non-defendants, including the Swetman Security firm, conspired, agreed, planned, and coordinated for the purpose of depriving Group I and Group II Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (*inter alia*, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

---

[16]     The Abandoned Plaintiffs do not assert claims under 42 U.S.C. § 1985.

377.     Signal, Recruiter Defendants, and Legal Facilitator Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Group I and Group II Plaintiffs of their rights and/or acted in furtherance of a conspiracy to deprive Group I and Group II Plaintiffs of their rights.

378.     Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Group I and Group II Plaintiffs of their rights.

379.     As a result of the unlawful acts of Signal, Recruiter Defendants, and Legal Facilitator Defendants, Group I and Group II Plaintiffs have suffered damages.

380.     Group I and Group II Plaintiffs seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

(a)     compensatory damages for deprivation of plaintiffs' constitutional rights;

(b)     damages for emotional pain and suffering, including fright, nervousness, grief, anxiety, depression, worry, mortification, shock, humiliation, indignity, embarrassment, panic, apprehension, terror, or ordeal experienced during the recruitment process and up to the point at which each plaintiff's employment at Signal was terminated;

(c)     compensation for all moneys paid during the recruitment process and in order to come to the United States to work for Signal, including, but not limited to:  recruitment fees; travel expenses; legal fees; medical testing; skills testing and administrative fees; losses on any personal or real property sold or pawned for the purposes of making payments in connection with the recruitment described herein; and fees and interest paid on any loans incurred as a result of the recruitment process and up to the point at which each plaintiff's employment at Signal was terminated;

(d)     compensation of deductions taken from plaintiffs' paychecks by Signal for room and board;

(e)     punitive damages; and

(f)     attorneys' and experts' fees and costs as authorized by 42 U.S.C. § 1988(b)-(c).

381.    For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended.

## FIFTH CLAIM FOR RELIEF

### FRAUD (All Defendants)

382.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

383.    Plaintiffs assert this cause of action under Indian law, Texas state law, or Mississippi state law (or otherwise applicable law, as determined by the court).[17]

384.    As set forth in the preceding paragraphs, and in exhibit 1, defendants, individually and through their agents, employees, and/or representatives, acting on a common plan, engaged in deliberate deception  by knowingly making materially false statements and representations to plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

385.    As set forth in the preceding paragraphs, and in exhibit 1, defendants engaged in deliberate deception by knowingly failing to disclose material facts to plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

386.    Defendants intended that the false statements made by defendants and/or their agents, employees, and/or representatives would induce plaintiffs to pay the exorbitant fees requested by the Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants, and to travel to the United States to work for Signal.

---

[17]    Plaintiffs assert this cause of action under Indian law in the first instance, and allege this cause of action in the alternative under Mississippi or Texas law if the Court determines Indian law does not apply.

387.    Defendants intended that the false statements made by defendants and/or their agents, employees, and/or representatives would induce plaintiffs to pay exorbitant fees to Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants, and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for Signal.

388.    Plaintiffs were entitled to rely on defendants' representations.  At the time the representations were made, plaintiffs did not know or have any reason to know that the representations were false.

389.    Relying on defendants' false representations regarding green cards and employment opportunities, plaintiffs paid large sums of money to Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants.

390.    Relying on defendants' false representations regarding green cards and employment opportunities, plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by defendants and their agents, employees and/or representatives.

391.    Relying on defendants' false representations regarding green cards and employment opportunities, plaintiffs sold personal and real property and surrendered employment opportunities in India and elsewhere.

392.    Relying on defendants' false representations regarding green cards and employment opportunities, plaintiffs left their homes and jobs in India and elsewhere and traveled to the United States to work for Signal.

393.    Defendants acted knowingly, willfully, maliciously, intentionally, recklessly, and without justification.

394.    Defendants engaged in these acts of deliberate deception in order to take unfair advantage of plaintiffs and to gain from plaintiffs' loss.

395.    As a direct and proximate result of defendants' knowing, willing, and intentional actions, statements, and omissions, plaintiffs lost the benefit of their bargain and have suffered injury to their property and/or persons, including but not limited to lost and unpaid wages, lost opportunities, pain and suffering (including emotional distress and humiliation), out-of-pocket expenses, and other pecuniary losses including loss of property and/or business.

396.    Plaintiffs seek all appropriate relief, including attorneys' fees, costs of this action, and compensatory and punitive damages, in an amount to be proved at trial, plus interest.

397.    For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended. Abandoned Plaintiffs do not seek damages related to this cause of action due to events that occurred after the later of when they arrived in the United States or their job offers were rescinded by Signal.

## SIXTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

*(All Defendants)*

398.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

399.    Plaintiffs assert this cause of action under Indian law, Texas state law, Mississippi state law (or otherwise applicable law, as determined by the court).[18]

---

[18]    Plaintiffs assert this cause of action under Indian law in the first instance, and allege this cause of action in the alternative under Mississippi or Texas law if the Court determines Indian law does not apply.

400.    As set forth in the preceding paragraphs, and in exhibit 1, defendants, individually and through their agents, employees, and/or representatives, acting on a common plan, negligently made positive untrue assertions to plaintiffs in a manner not warranted by the information, and in spite of the contrary information available to defendants regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

401.    As set forth in the preceding paragraphs, and in exhibit 1, defendants negligently failed to disclose material facts to plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

402.    As set forth in the preceding paragraphs, and in exhibit 1, defendants negligently failed to confirm the representations they made concerning the job opportunities for Signal and the plans for and possibility of obtaining a green card from Signal were truthful.

403.    Defendants intended that the untrue statements and concealments made by defendants and/or their agents, employees, and/or representatives would induce plaintiffs to pay the exorbitant fees requested by Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for Signal.

404.    Plaintiffs were entitled to rely on defendants' representations.  At the time the representations were made, plaintiffs did not know or have any reason to know that the representations were false.

405.    In reasonable reliance on defendants' false or negligent representations regarding green cards and employment opportunities, plaintiffs paid large sums of money to Recruiter Defendants, the Legal Facilitator Defendants, and/or the Labor Broker Defendants.

406.   In reasonable reliance on defendants' false or negligent representations regarding green cards and employment opportunities, plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by defendants and their agents, employees and/or representatives.

407.   In reasonable reliance on defendants' false or negligent representations regarding green cards and employment opportunities, plaintiffs sold personal and real property and surrendered employment opportunities in India and elsewhere.

408.   In reasonable reliance on defendants' false or negligent representations regarding green cards and employment opportunities, plaintiffs left their homes and jobs in India and elsewhere and traveled to the United States to work for Signal.

409.   Defendants acted knowingly, willfully, maliciously, intentionally, recklessly, and without justification.

410.   As a direct and proximate result of defendants' knowing, willing, intentional, and/or negligent actions, statements and omissions, plaintiffs have suffered injury to their property and/or persons, including but not limited to lost and unpaid wages, lost opportunities, pain and suffering (including emotional distress and humiliation), out-of-pocket expenses, and other pecuniary losses including loss of property and/or business.

411.   Plaintiffs seek all appropriate relief from defendants, jointly and severally, including attorneys' fees, costs of this action, and compensatory and punitive damages, in an amount to be proved at trial, plus interest.

412.   For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended. Abandoned Plaintiffs do not seek damages related to this cause of action due to events that

occurred after the later of when they arrived in the United States or their job offers were rescinded by Signal.

## EIGHTH CLAIM FOR RELIEF

### BREACH OF CONTRACT AND QUASI-CONTRACT CLAIMS

413.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

414.    Plaintiffs assert this cause of action under Indian law, Texas state law, Mississippi state law (or otherwise applicable law, as determined by the court).[19]

415.    As set forth in the preceding paragraphs, defendants, individually and through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for plaintiffs in the United States, as well as steady work opportunities in the United States with Signal and/or Labor Broker Defendants in exchange for plaintiffs' payment of exorbitant fees to defendants and their employees, agents and/or representatives and agreement to work for Signal and/or the Labor Broker Defendants.

416.    Plaintiffs accepted defendants' offers, paid the agreed-upon fees, and performed the agreed-upon work, or incurred significant costs and travelled to the United States to perform the agreed-upon work.

417.    Defendants breached their contracts with plaintiffs by failing to comply with their binding promises regarding permanent residence and immigration status.

418.    Defendants further breached their contracts with the Abandoned Plaintiffs by not providing them with the agreed-upon employment.

---

[19]    Plaintiffs assert this cause of action under Indian law in the first instance, and allege this cause of action in the alternative under Mississippi or Texas law if the Court determines Indian law does not apply.

76

419.     In reliance on these agreements, plaintiffs paid large sums of money and entered into substantial debt, surrendered other employment opportunities, and incurred other financial losses, and traveled to the United States to work at Signal.

420.     Defendants had no intention of honoring their offers, which they made knowingly, willfully, maliciously, intentionally, recklessly, and without justification.  As set forth in the other counts of this complaint, defendants' conduct in this regard constitutes independent intentional torts separate from the breach of contract alleged in this Count.

421.     Plaintiffs had both a pecuniary and nonpecuniary interest in their contracts.

422.     As a direct and proximate, probable and foreseeable result of defendants' breaches, plaintiffs lost the benefit of their bargain and suffered injury to their property and/or persons, including but not limited to lost and unpaid wages, lost opportunities, pain and suffering (including emotional distress and humiliation), out-of-pocket expenses, and other pecuniary losses including loss of property and/or business.

423.     Plaintiffs seek all appropriate relief from defendants, jointly and severally, including attorneys' fees, costs of this action, and compensatory and punitive damages, in an amount to be proved at trial, plus interest.

424.     For this cause of action, Group I and Group II Plaintiffs do not seek damages from any defendant relating to events that occurred after his employment with Signal ended. Abandoned Plaintiffs do not seek damages related to this cause of action due to events that occurred after the later of when they arrived in the United States or their job offers were rescinded by Signal.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs request the following relief:

a.        Compensatory damages;

b.        Punitive damages;

c.        Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

d.        An award of all prevailing party costs authorized by law, including attorney fees;

e.        A finding of alter ego between Billy R. Wilks and J & M Associates thus piercing

J & M Associates' corporate veil;

h.        A finding that J & M Marine is the successor of J & M Associates; and

i.        Such other relief as the Court deems just and appropriate.

Respectfully submitted this 11th day of August, 2014,

/s/ **_Meredith B. Stewart_**

| | |
|---|---|
| Michael Blechman (*pro hac vice to be submitted*) | Meredith B. Stewart |
| New York Bar No. 1074814 | Louisiana Bar No. 34109 |
| Randolph Sherman (*pro hac vice to be submitted*) | Southern Poverty Law Center |
| | 1055 St. Charles Ave., # 505 |
| New York Bar No. 1040278 | New Orleans, LA  70130 |
| Jane Parver (*pro hac vice to be submitted*) | 504-486-8982 |
| | Fax:  504-486-8947 |
| New York Bar No. 1008267 | meredith.stewart@splcenter.org |
| Michael S. Bullerman (*pro hac vice to be submitted*) | Daniel Werner (*pro hac vice to be submitted*) |
| New York Bar No. 4483970 | Georgia Bar No. 422070 |
| Tricia Beckles (*pro hac vice to be submitted*) | Immigrant Justice Project |
| | Southern Poverty Law Center |
| New York Bar No. 4665022 | 233 Peachtree Street, Suite 2150 |
| Thomas Szivos (*pro hac vice to be submitted*) | Atlanta, Georgia  30303 |
| | Telephone:  (404) 521-6700 |
| New York Bar No. 4889226 | Facsimile:  (404) 221-5857 |
| Yonina Rosenbaum (*pro hac vice to be submitted*) | daniel.werner@splcenter.org |
| New York Bar No. 4942108 | |
| Kaye Scholer LLP | |
| 425 Park Avenue | |
| New York, NY  10022 | |
| 212-836-8000 | |
| michael.blechman@kayescholer.com | |
| randolph.sherman@kayescholer.com | |
| jane.parver@kayescholer.com | |
| michael.bullerman@kayescholer.com | |
| tricia.beckles@kayescholer.com | |
| thomas.szivos@kayescholer.com | |
| yonina.rosenbaum@kayescholer.com | |